# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**December 30, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

FRED MARSHALL,                              )
                                            )
    Plaintiff/Appellant,                    )          Rutherford Circuit
                                            )          No. 32618
VS.                                         )
                                            )          Appeal No.
JACKSON & JONES OILS, INC.,                 )          M1997-00104-COA-R3-CV
                                            )
    Defendant/Appellee.                     )


APPEAL FROM THE CIRCUIT COURT FOR RUTHERFORD COUNTY
AT MURFREESBORO, TENNESSEE

THE HONORABLE J. S. DANIEL, JUDGE


For the Plaintiff/Appellant:                For the Defendant/Appellee:

Frank M. Fly                                Allen Shoffner
Murfreesboro, Tennessee                     Shelbyville, Tennessee


# AFFIRMED IN PART; VACATED IN PART;
# AND REMANDED


WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves a contract dispute between a service station owner and his gasoline supplier. The owner filed suit against the supplier in the Circuit Court for Rutherford County alleging that the supplier's breach of the retail price provisions of their contract forced him out of business. The supplier counterclaimed for the unpaid cost of gasoline. The trial court, sitting without a jury, found that the supplier had not breached the agreement and that the supplier had not proved that it was entitled to payment for unpaid gasoline. Both the owner and the supplier have appealed. The owner asserts that the trial court misconstrued the terms of the supply contract; while the supplier argues that the trial court erred by dismissing its counterclaim. We have determined that the trial court misconstrued the contract and, therefore, vacate the judgment for the supplier on the owner's breach of contract claim. We have also determined that the trial court correctly dismissed the supplier's counterclaim. Accordingly, we vacate the judgment in part and remand the case for the assessment of damages against the supplier.

## I.

Fred Marshall operates a Handy Market on the corner of Bradyville Road and Minerva Drive in Murfreesboro. In 1989, fearing competition from other convenience store chains, he purchased a service station at the same intersection in order to prevent the site from being acquired by a competitor. In August 1989, he signed a ten-year "consignment supply agreement" with Jackson & Jones Oils, Inc. In return for Mr. Marshall's agreement that Jackson & Jones would be his exclusive source for gasoline, diesel fuel, and other petroleum products, Jackson & Jones agreed to furnish him with the necessary above-ground equipment and gasoline needed to operate his business.

The agreement, as its name indicated, was a true consignment. Mr. Marshall did not purchase petroleum products from Jackson & Jones and then resell them to the public. Rather, Jackson & Jones retained ownership of the fuel delivered to Mr. Marshall's service station until it was sold through either the self-service or full-service pumps. The agreement provided that the parties would be compensated by splitting the proceeds from the sale of the petroleum products. For self-service gasoline, the parties split the profits equally. For full-service gasoline, Mr. Marshall received a larger share of the proceeds "as compensation for labor cost in pumping the product and providing full service." The agreement required Mr. Marshall to file a weekly report of the number of gallons of fuel sold from each pump for the preceding week and to pay Jackson & Jones a "remittance price" for each gallon sold.

The consignment supply agreement defined the "remittance price" as the retail pump price minus Mr. Marshall's share of the "gross margin."[1] The "gross margin" was the amount that the retail pump price of the fuel had been marked up by mutual agreement over the "transfer cost" of the fuel.[2] The "transfer cost" of the fuel was the cost of the fuel to Jackson & Jones plus the transportation costs plus the applicable state and federal taxes.[3]

The agreement did not set a specific retail pump price for the fuel sold at Mr. Marshall's service station. Instead, it provided that the pump price for any given sales report period would be the amount set "by mutual agreement" between Mr. Marshall and Jackson & Jones. During the negotiations leading up to the agreement, John Keith Jackson of Jackson & Jones prepared a proposal suggesting that the pump price for self-service fuel at Mr. Marshall's store should be one cent per gallon higher than the pump price of the unbranded gasoline being sold at the Kwik Sak convenience store nearest to Mr. Marshall's station. This concept was incorporated into paragraph eight of the parties' agreement which provided, in part, that "[t]he above computation [the computation of Mr. Marshall's share of the gross margin] applies to product sold through Operator's self-service operation and is based on being branded and giving a one cent spot to any unbranded marketers in the area."[4]

The pricing mechanism in the consignment supply agreement worked profitably for both Mr. Marshall and Jackson & Jones until the Gulf War. In September 1990, Jackson & Jones began dictating to Mr. Marshall what the retail pump price of the fuel would be rather than arriving at a price by mutual agreement. In Mr. Marshall's words:

> It turned around and there was no longer a mutual agreement. [Jackson & Jones] would call me each Friday morning to tell me what the pump prices will be and the self-service will be on the street, and that was it irregardless of what the competition was doing. I would relate to [Jackson & Jones] that Kwik Sak is

---

[1][Remittance price] = [Retail pump price] − [Marshall's share of gross margin].

[2][Gross margin] = [Retail pump price] − [Transfer cost].

[3][Transfer cost] = [Wholesale cost of fuel] + [Transportation costs] + [state & federal taxes].

[4]Mr. Marshall explained how the consignment agreement worked in practice as follows:

> If I priced the pump, self-service 119.9 or a one cent spot, that means Kwik Sak would be at 118. Now, to clarify what the price would be, Jackson & Jones would call me and tell me what their cost would be, what the actual cost would be for the gasoline, I'd take that actual cost from Jackson & Jones to me, minus 119.9 pump price, and let's say the actual cost was $1.10 per gallon, so that would leave 9.9 cents gross profit for gasoline in that particular price product. And you would divide that by two, which would be 50 percent, that would be my gross margin profit and that would also be Jackson & Jones gross margin profit above whatever they already charged me for cost.

over there selling gasoline for 101.9, do you want me to go to
$109.9? Do you realize what it's going to do to business?

Despite Mr. Marshall's repeated objections, Jackson & Jones continued to instruct him to increase the price of his self-service fuel until it was eight cents per gallon higher than the price of the self-service fuel at the nearest Kwik Sak. Jackson & Jones blamed these price increases on the increased cost its supplier was charging for fuel. When Mr. Marshall inquired why the pump price of the fuel being sold at his station was no longer being set at one cent per gallon higher than the comparable fuel being sold at the Kwik Sak, Mr. Jackson informed him that as far as Jackson & Jones was concerned, the pump price no longer had any relation to the pump price at Kwik Sak.

Mr. Marshall notified Jackson & Jones in October 1992 that its refusal to price the fuel competitively was forcing him out of business. Mr. Marshall closed his station two months later. By that time, the price of self-service gasoline at Mr. Marshall's service station was nine cents per gallon higher than the self-service gasoline at the nearby Kwik Sak. Mr. Marshall's sales of fuel had dwindled to less than one-half of their 1990 levels, and he had lost a significant amount of his repair business. As he put it, "The price [of gasoline] got so high that I wouldn't do no business and basically Jackson & Jones priced me out of business and I had to close up the books."

Mr. Marshall sued Jackson & Jones in the Circuit Court for Rutherford County, alleging that the unilateral dictation of the retail price of self-service gasoline breached the consignment supply agreement and had forced him out of business. Jackson & Jones denied that it had breached the agreement and counterclaimed for $5,637.60 plus late charges and interest for the fuel they claimed Mr. Marshall had never paid for. Following a bench trial, the trial court (1) determined that the consignment supply agreement permitted Jackson & Jones to set the price of the fuel sold at Mr. Marshall's station based solely on the wholesale cost of fuel, the transportation costs, and state and federal taxes and (2) dismissed the provision linking the pump price of the fuel to a one-cent spot over unbranded marketers in the area as "poorly drafted." Accordingly, the trial court determined that Jackson & Jones had not breached the agreement. The trial court also dismissed Jackson & Jones's counterclaim for failure of proof. Both parties have appealed.

## II.
### MR. MARSHALL'S BREACH OF CONTRACT CLAIM

-4-

Mr. Marshall asserts that the trial court misconstrued paragraph eight of the consignment supply agreement. Specifically, he argues that the trial court erred by dismissing as "unreasonable" the provision in the agreement linking the retail pump price of fuel sold at Mr. Marshall's service station with the retail price of fuel at other nearby unbranded marketers. We agree that the trial court erred by failing to give effect to this provision.

## A.

The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions. *See Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). In the case of written contracts, these intentions are reflected in the contract itself. Thus, the search for the contracting parties' intent should focus on (1) the four corners of the contract, *see Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998); *Hall v. Jeffers*, 767 S.W.2d 654, 657-58 (Tenn. Ct. App. 1988), (2) the circumstances in which the contract was made. *See Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *Pinson & Assocs. Ins. Agency, Inc. v. Kreal,* 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990), and (3) the parties' actions in carrying out the contract. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983); *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79, 84 (Tenn. Ct. App. 1983).

In the absence of fraud or mistake, courts should construe contracts as written. *See Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); *Whaley v. Underwood*, 922 S.W.2d 110, 112 (Tenn. Ct. App. 1995). The courts should accord contractual terms their natural and ordinary meaning, *see Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975), and should construe them in the context of the entire contract. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996); *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). The courts should also avoid strained constructions that create ambiguities where none exist. *See Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47-48 (Tenn. Ct. App. 1993).

The courts may not make a new contract for parties who have spoken for themselves, *see Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and may not relieve parties of the contractual obligations simply because these obligations later prove to be burdensome or unwise. *See Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991). Thus, when called upon to interpret a contract, the courts may not favor either party.

*See Heyer-Jordan & Assocs., Inc v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990). However, when a contract contains ambiguous provisions, those provisions will be construed against the party responsible for drafting them. *See Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 153-54, 425 S.W.2d 590, 592-93 (1968); *Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 777 (Tenn. Ct. App. 1997).

**B.**

Paragraph eight of the agreement contains the financial terms of the parties' contractual relationship. It contains three formulae[5] for determining how the proceeds from the sale of the gasoline should be distributed to Mr. Marshall and Jackson & Jones. All the variables in these formulae, except for the "retail pump price" of the gasoline, were established either in the agreement itself or by other objective, verifiable standards.[6] The retail pump price is the only variable in these formulae that the agreement requires to be set by the parties "by mutual agreement and to be "based on . . . giving a one cent spot to any unbranded marketers in the area."

As the trial court construed the agreement, the retail pump price was essentially dictated by the price Jackson & Jones's supplier was charging for the fuel. The contract, however, does not say that. As evidenced by the language about the one cent spot over area unbranded marketers, the contract makes pump pricing of fuel for any given reporting week competitively driven, not simply driven just by what we normally think of as wholesale cost.

Mr. Jackson testified that Mr. Marshall had to pay Jackson & Jones "based on his cost as computed by the cost to the station plus whatever [Mr. Marshall's mark-up] might have been . . .." While that may be how Mr. Jackson desired the arrangement to work, the contract does not say that.[7] Paragraph seven of the agreement merely required Mr. Marshall to pay

---

[5]*See* nn. 1 - 3.

[6]The calculation for determining Mr. Marshall's share of the "gross margin" was included in paragraph eight of the agreement. The "transfer cost" was to be determined by Jackson & Jones, but was based on the wholesale cost of the fuel which was established by Jackson & Jones's supplier, the transportation cost which was established by Jackson & Jones, and the state and federal taxes which were established by law.

[7]This case calls to mind an observation by an English court, anthologized by Professor Williston in his treatise: "It is a poplar belief, especially prevalent amongst lawyers, that the efficient business man requires that obligations incurred in business should be expressed in writing in simple, intelligible and unambiguous language. It is a belief encouraged by the sayings of business men themselves. But in practice nothing appears to be further from the truth. Business men habitually adventure large sums of money on contracts which, for the purpose of defining legal obligations, are a mere jumble of words. They trust to luck or the good faith of the opposite party, with the

(continued...)

Jackson & Jones a "remittance price" on each gallon of gasoline sold. As defined in the contract, the remittance price was nothing more than Jackson & Jones's half of the gross margin, which could have been any figure. Contrary to Mr. Jackson's assertion, nowhere does the agreement require Mr. Marshall to pay Jackson & Jones some wholesale cost figure for the gasoline. Under the agreement, Mr. Marshall did not buy the fuel wholesale and then resell it retail, and the trial court erred in basing its construction of the contract on that notion.

Mr. Marshall was knowledgeable about selling gasoline at retail. When he entered into the agreement with Jackson & Jones, he wanted to be able to price his gasoline competitively to attract customers who would also pay him to service and repair their vehicles.[8] Mr. Jackson responded to Mr. Marshall's desire for competitive pricing by proposing a way to price self-service gasoline that would make it competitive within one cent per gallon with gasoline for sale at a nearby self-service convenience store. Mr. Jackson's competitive pricing proposal was ultimately incorporated into paragraph eight of the consignment agreement drafted by Jackson & Jones and accepted by Mr. Marshall. When we review the entire record in context, including the parties' original course of dealings and Mr. Marshall's later protests, we agree with Mr. Marshall that the mutual agreement on pricing was intended to be pegged on maintaining a closely competitive price, ideally a one cent spot, over his nearby unbranded competition.

In our view, the trial court gave too little weight to the competitive pricing provision in paragraph eight. In view of the plain meaning of the language of that provision, as well as the history of how it was included in the agreement and the parties' course of dealing after the agreement was signed, we agree with Mr. Marshall that Jackson & Jones breached the consignment agreement when it began unilaterally imposing an uncompetitive and ultimately destructive pricing structure on Mr. Marshall after August 1990.

## III.
### JACKSON & JONES'S COUNTERCLAIM FOR UNPAID FUEL

---

[7](...continued)
comfortable assurance that any adverse result of litigation may be attributed to the hairsplitting of lawyers and the uncertainty of the law." 4 Samuel Williston, *Treatise on the Law of Contracts* § 600A (Walter H. Jaeger ed., 3d ed. 1961).

[8]Mr. Marshall testified that he anticipated that the service and repair business was where the real money would be made.

Jackson & Jones contends that the trial court erred in dismissing as unproven its counterclaim for fuel delivered to Mr. Marshall's service station that had not been paid for. Jackson & Jones's evidence to support this counterclaim consisted of a delivery invoice devoid of any dollar figure and the testimony of its president that Mr. Marshall owed "to my knowledge . . . around $10,456." When prompted by his lawyer to be more specific concerning the elements of the $10,456 figure, the president stated that some unspecified amounts were for a "service charge" and a "carrying charge." Jackson & Jones presented no evidence showing specific amounts of fuel delivered to Mr. Marshall's service station on any particular date and never provided a means for either the trial court or this court to understand the difference between the $5,637.60 alleged its counterclaim and the "around $10,456 testified to by its president.

It is elemental that a party asserting a lawsuit claim must establish the claim by satisfactory proof convincing to the fact-finder. *See Hamilton v. Zimmerman*, 37 Tenn. (5 Sneed) 39, 44 (1857). To carry the burden of proof, a party may employ either direct evidence from witnesses with personal knowledge or circumstantial evidence from persons who know and can testify to related facts that reasonably tend to establish the desired facts. *See Marquet v. Aetna Life Ins. Co.*, 128 Tenn. 213, 225, 159 S.W. 733, 736 (1913). As Jackson & Jones Oil points out, while courts ordinarily will accept a witness' unimpeached, uncontradicted testimony as true, *see Frank v. Wright*, 140 Tenn. 535, 541, 205 S.W. 434, 435 (1918), that testimony must still induce some certainty in the fact-finder's mind. *See Standard Oil Co. v. Roach*, 19 Tenn. App. 661, 666, 94 S.W.2d 63, 66 (1935).

The vague and conclusory testimony of Jackson & Jones's president, procured only by leading direct examination and wholly uncorroborated with any business records, failed to induce conviction in the trial court's mind as to what amount, if any, Mr. Marshall might have owed Jackson & Jones for fuel. Having reviewed the record, we agree with the trial court that Jackson & Jones failed to prove their counterclaim by a convincing preponderance of the evidence.

## IV.

We reverse the dismissal of Mr. Marshall's complaint and affirm the dismissal of Jackson & Jones counterclaim. We remand this case to the trial court to determine Mr. Marshall's damages for Jackson & Jones's breach of the consignment supply agreement and

for whatever other proceedings may be required. We tax the costs of this appeal to Jackson & Jones Oils, Inc. for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

-9-

CONCUR:


_____
HENRY F. TODD,
PRESIDING JUDGE, M.S.


_____
BEN H. CANTRELL, JUDGE