IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2001 Session

**SUE S. PLEMMONS v. MIKE GRAVES, ET AL.**

**Appeal from the Circuit Court for Monroe County**
**No. V99334P     Lawrence H. Puckett, Judge**

**FILED NOVEMBER  5, 2001**

**No. E2001-00733-COA-R3-CV**

This case involves whether Mike and Bonnie Graves d/b/a/ GRESCO ("Defendants" or "Lessees") breached a commercial lease with Sue S. Plemmons ("Plaintiff" or "Lessor"). The lease was entered into in 1983 and permitted the installation of a billboard on Plaintiff's property.  Plaintiff claims Lessees breached the lease when they paid the rent for 1999 late and when they refused to pay an increase from $250 to $1,500 in the annual rent.  The Trial Court held that Lessees did not breach the lease and dismissed the case.  We affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the**
**Circuit Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Doris M. Matthews, Madisonville, Tennessee, for the Appellant Sue S. Plemmons.

H. Chris Trew, Athens, Tennessee, for the Appellees Mike Graves and Bonnie Graves d/b/a GRESCO.

# OPINION

## Background

This litigation involves a lease entered into in 1983 wherein Plaintiff's predecessor leased certain property permitting the installation of a billboard for outdoor advertising on the property. Plaintiff's predecessor assigned her interest as Lessor to Plaintiff in March 1985. Plaintiff claimed in her complaint that in June of 1988, she and Lessees' predecessor in interest orally agreed to increase the annual rent from $250 to $275, which amount Lessees' predecessor paid through 1995. Plaintiff claimed that after the lease was purchased by Lessees in 1995 or 1996, Lessees refused to pay this increased rent. Plaintiff informed Lessees in May of 1998 that the "advertising status of the display had changed" and an increase in the annual rent to $1,500 was warranted. Lessees did not agree to pay any rental increase. Plaintiff further claimed that after Lessees were late in tendering the $250 in rent for 1999, she returned their check and demanded that the billboard be removed from her property. Lessees' answer essentially denied the pertinent allegations contained within the complaint, asserting they had a valid lease and were in compliance with its terms.

The relevant provisions of the lease are as follows:

3. The term of this lease shall commence on June 15, 1983,[1] and unless terminated earlier in the manner hereinafter set forth, shall continue for an initial term of ten years from the first day of the first month following erection of the advertising display(s) (hereinafter called "the effective date"), and shall continue thereafter, at the option of the Lessee, for a second term of ten years, and thereafter from year to year, on the same terms, until terminated *as of any subsequent anniversary of the effective date* by written notice of termination given not less than sixty days prior to such anniversary date by either the Lessor or Lessee. (emphasis in original).

4. In consideration of the foregoing and the mutual promises herein contained, and other good and valuable consideration, the Lessee agrees to pay the Lessor … at the rate of $250.00 per year for such periods of time as the display(s) contemplated hereunder is (are) in position. Such yearly rental is to be paid in advance (subject to a 30 day delay for processing) with supplementary adjustments to be made promptly when the advertising status of the display(s) is changed. When feasible, the payment date will be adjusted to coincide with the anniversary of the effective date.

---

[1] The year was apparently a typographical error and should read 1984 inasmuch as the lease was signed in December of 1983.

8.     Neither the Lessor nor the Lessee shall be bound by any agreement or representation, expressed or implied, not contained herein.  This lease shall be deemed to have been accepted and its terms enforceable only upon the acceptance hereof by the Lessee in the space provided.  Following such acceptance, it shall insure (sic) to the benefit of and be binding upon the parties hereto and to their respective tenants, heirs, successors, personal representatives, executors, administrators, and assigns.

10.     If at any time the highway view of the Lessee's displays is obstructed or obscured, or the advertising value of the displays is impaired or diminished, or the use or installation of such displays is prevented or restricted by law or by the Lessee's inability to obtain any necessary permits or licenses, or if the Lessee is unable, for any period of ninety (90) consecutive days or more, to secure and maintain a suitable advertising contract for the displays, or if there occurs a diversion of traffic from, or a change in the direction of traffic on highways leading past the Lessee's displays, the Lessee may, at its option, terminate this lease by giving the Lessor fifteen (15) days written notice ….

The original lease was entered into by Loren Plemmons Hentchel ("Hentchel"), Plaintiff's daughter.  Hentchel owned the property when the lease was entered into in 1983, but deeded the property to Plaintiff in 1985.  At trial, Hentchel testified that the original term of the lease was 10 years, with an option to continue for another 10 years, then year to year after the second ten year period expired.  The original lease called for a rental payment of $250.  Hentchel also testified that the provision allowing for "supplementary adjustments" in paragraph 4 was in the lease because:

My understanding was, when I had the discussion with Mr. Callahan, I made it clear to him that this property is investment type property. We knew that Highway 411 would be four laned from Maryville I think until it gets to I-75 in Georgia, and at sometime this property would be more valuable, would be sold, and wanted to be sure that we are not boxing ourselves in to this rate of $250 annually for a twenty year period.

Approximately June 14, 1984, Hentchel called the original lessee inquiring if he had found a tenant for the billboard.  The original Lessee responded that he had found one in March, and that he had forgotten to send the rent check and would do so.  The first rental payment was, therefore, late.  Hentchel testified that according to the lease, all rental payments were due in April. Since the rent checks were actually received in June, all of them were technically late under Plaintiff's proof.  Even though the rent was due in April, Hentchel and Plaintiff considered the due date to be June 15th.  As long as the annual payment was received by July 15th (after allowing 30

days for processing as set forth in the lease), they considered the payment timely. Hentchel agreed that the 1998 rental payment was received after July 15th, but Plaintiff gave Lessees the "benefit of the doubt" and made no protest. Hentchel acknowledged that the various events set forth in paragraph 10 of the lease described situations which would make the value of the billboard decrease, not increase, and that nothing in that paragraph allowed the lessor to terminate the lease. Notwithstanding the language in paragraph 10, Hentchel testified that the "supplementary adjustments" language in paragraph 4 did not pertain only to those situations described in paragraph 10 which would decrease the value of the billboard. Rather, Hentchel asserted that the language in paragraph 4 could be used by the lessor when the value of the billboard increased, or by the lessee if it decreased.

Plaintiff testified she purchased the property on which the billboard is located from her daughter in 1985. Plaintiff had nothing to do with the preparation of the lease. She testified that the rental payments were received in June of each year except for the payment in 1998 which she received around July 30th. Plaintiff testified she wrote a letter to Lessees in May of 1998 requesting that the rent be increased to $1,500 per year because the value of the property had increased. Plaintiff admitted she unilaterally made this request for increased rent based on her claim that she had been offered that sum by another potential lessee. Notwithstanding this request, Plaintiff received and accepted only $250 in rent on July 30, 1998. When the rent was due in 1999, she received a check for $250 on July 22nd. Plaintiff sent this check back to Lessees along with a letter requesting that the billboard be removed from her property. Plaintiff did not state in her letter that she was returning the check because it was late. Instead, Plaintiff wanted the billboard off the property because she had sold the property to a third party.[2] In October, Plaintiff sent another letter to Lessees stating that she had terminated the lease by her July letter and once again requesting that the billboard be removed. Lessees responded with a letter stating they had a valid lease which did not expire until the year 2003. Lessees then sent Plaintiff another check for $250, which she once again returned to them.

Lessees moved for a "directed verdict" after Plaintiff concluded her proof, arguing that Plaintiff had failed to meet her burden of proof on the various claims. The Trial Court agreed. The Trial Court concluded that the reference to "supplemental adjustments" found in paragraph 4 of the lease was defined by paragraph 10. In other words, in order to make a supplementary adjustment to the rental payment pursuant to paragraph 4, one of the events described in paragraph 10 had to happen. According to the Trial Court, paragraph 10 did not give Plaintiff the right to increase the amount of the rental payments. Next, the Trial Court addressed whether there was a breach of the lease. Plaintiff admitted in her testimony that the reason she did not accept the 1999 rental payment and attempted to terminate the lease was because of a dispute as to the amount of the annual rental payment, not because the 1999 rent was late. In accordance with its previous ruling, the Trial Court concluded this was not a proper basis to terminate the lease because Plaintiff "didn't have a right to demand the $1500 …." The Trial Court also noted there was no provision in the lease

---

[2] While Plaintiff testified she had a down payment on the sale of this property, the sale never actually occurred because the buyer "couldn't get all of his money together."

-4-

for forfeiture in the event of late payment. The Trial Court likewise observed that Plaintiff accepted the 1998 rental payment around July 30th with no protestation, but then claimed a breach when she received the 1999 payment on July 22nd. The Trial Court entered an Order granting Lessees' motion for "directed verdict" and dismissed the case, stating that after "hearing the proof … Plaintiff has failed to present sufficient evidence that the Defendants breached the contract at issue." Plaintiff appeals.

### Discussion

On appeal, Plaintiff challenges two rulings by the Trial Court. First, Plaintiff contends she had the right to terminate the lease as a result of the late rental payment in 1999. Second, Plaintiff claims the lease was breached when Lessees failed to negotiate a rental increase due to changes in the advertising status of the property resulting from an increase in the rental value of the billboard.

This was a bench trial without the intervention of a jury. Although Lessees moved for a "directed verdict", the proper request would have been for a motion to dismiss pursuant to Tenn. R. Civ. P. 41.02(2). This rule provides that in an action tried by the court without a jury, the defendant may move for dismissal after the plaintiff has completed presentation of evidence on the ground that upon the facts and the law, the plaintiff has shown no right to relief. We thus treat Lessees' motion for directed verdict as a motion to dismiss under Rule 41.02(2). The standard of review regarding a dismissal under Tenn. R. Civ. P. 41.02(2) is set forth in *Atkins v. Kirkpatrick,* 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991):

> If a motion to dismiss is made at the close of Plaintiffs' proof in a non-jury case, under T.R.C.P. Rule 41.02(2), the trial court must impartially weigh and evaluate the evidence just as though it were making findings of fact and conclusions of law after presentation of all the evidence. If the plaintiff's case has not been established by a preponderance of the evidence, the case should be dismissed if, on the facts found . . . [and] the applicable law, plaintiff has shown no right to relief. *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734 (Tenn. 1977).

> Our scope of review is pursuant to Rule 13(d) T.R.A.P. The [factual] findings of the trial court in granting such a motion are accompanied by a presumption of correctness and, unless the preponderance of the evidence is otherwise, those findings must be affirmed. *College Grove Water Utility District v. Bellenfant*, 670 S.W.2d 229 (Tenn. App. 1984).

*Atkins*, 823 S.W.2d at 552. *See also Twitty v. Young*, No. 03A01-9801-CH-00031, 1998 WL 453681 at \*\*2, \*\*3 (Tenn. Ct. App., Aug. 6, 1998)(*perm. app. den.* Dec. 21, 1998). Review of questions of

law is *de novo*, without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions. *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn. Ct. App. 1999). In the case of written contracts, these intentions usually are reflected best in the contract itself. The search for the contracting parties' intent should focus on the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract. *Marshall*, 20 S.W.3d at 681. In the absence of fraud or mistake, courts should construe contracts as written, accord contractual terms their natural and ordinary meaning, and should construe them in the context of the entire contract. *Id.* The courts also should avoid strained constructions that create ambiguities where none exist. *Id.* at 682 (citing *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47- 48 (Tenn. Ct. App.1993)). "The courts may not make a new contract for parties who have spoken for themselves … and may not relieve parties of the contractual obligations simply because these obligations later prove to be burdensome or unwise." *Id.* (citing *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991)). While a court cannot favor either party, when a contract contains ambiguous provisions, those provisions will be construed against the party responsible for drafting them. *Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 777 (Tenn. Ct. App. 1997).

We do not believe the Trial Court committed reversible error when it concluded that Plaintiff had not proven by a preponderance of the evidence that Lessees breached the lease. In *Cain Partnership, Ltd. v. Pioneer Investment Services Company*, 914 S.W.2d 452 (Tenn. 1996), our Supreme Court was interpreting a non-residential commercial lease and adopted the following provisions of the Restatement of Property (Second), § 13.1 (1977):

Nonperformance of Tenant's Promise--Remedies Available

Except to the extent the parties to a lease validly agree otherwise, if the tenant fails to perform a valid promise contained in the lease to do, or to refrain from doing, something on the leased property or elsewhere, and as a consequence thereof, the landlord is deprived of a significant inducement to the making of the lease, if the tenant does not perform his promise within a reasonable period of time after being requested to do so, the landlord may:

(1) terminate the lease and recover damages; or

(2) continue the lease and obtain appropriate equitable and legal relief, including

(a) recovery of damages, and

-6-

> (b) recovery of the reasonable cost of performing the tenant's promise.

*Cain Partnership*, 914 S.W.2d at 459. In the present case, the Trial Court correctly noted that the lease did not contain a specific forfeiture provision for the late payment of rent. The proof at trial showed that when the 1999 rent was late, Plaintiff never protested until after the rent was received on July 22nd, which was seven days late according to when Plaintiff considered the rent due. Although late with the rent, Lessees thus performed their "promise within a reasonable period of time". This conclusion is further supported by Plaintiff's testimony that in her communications with Lessees, she did not attempt to terminate the lease because the 1999 rent was late. In fact, Plaintiff admitted at trial that the reason she sent the rent check back to Lessees was because she wanted more rent, not because it was late. Since we conclude that Lessees were not in default of the lease based on the 1999 rental payment, we need not decide whether the parties' past course of dealings in paying and accepting late rental payments constitute a waiver with respect to the 1999 rental payment.

Paragraph 4 of the lease provides "supplementary adjustments" in the rent are to be made promptly when the "advertising status" of the display is changed. Paragraph 10 sets forth in detail various events which would affect the advertising status. Paragraph 10 only speaks to events which would decrease the value of the lease, such as the billboard being obstructed, etc. Paragraph 10 does not afford Plaintiff the opportunity to increase the rent for any reason. The Trial Court agreed with the position advanced by Lessees that any potential change in advertising status which would permit an adjustment in the rent was defined by Paragraph 10 of the lease. While this conclusion is not the only one that could have been reached, we cannot say that the Trial Court committed reversible error when it reached this result.

## Conclusion

The judgment of the Trial Court is affirmed. This case is remanded to the Trial Court for further proceedings as required, if any, consistent with this Opinion, and for collection of costs below. Costs of appeal are taxed to the Appellant, Sue S. Plemmons, and her surety.

_____
D. MICHAEL SWINEY

-7-