IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2005 Session

## POLYGRAM RECORDS, INC., ET AL. v. LEGACY ENTERTAINMENT GROUP, LLC.

Appeal from the Chancery Court for Davidson County
No. 97-3597-I     Claudia Bonnyman, Chancellor

No. M2003-02608-COA-R3-CV - Filed January 20, 2006

Three competing parties claim rights to commercially exploit performances of legendary performer Hank Williams that were recorded and broadcast by WSM Radio in the 1950s. Polygram Records, Inc., claims exclusive phonograph exploitation rights, relying on a contract Williams entered into with its predecessor in interest, MGM Records. Legacy Entertainment Group, LLC., claims rights of exploitation to the recordings under a chain of title. Williams' heirs, Hank Williams, Jr. and Jett Williams, contend neither Legacy nor Polygram have contractual rights to exploit Williams' performances embodied in the WSM recordings, and further contend the rights passed to his heirs. The trial court summarily dismissed the claims of Polygram and Legacy, finding neither own rights to exploit the recorded performances, and the rights belong to Williams' heirs. Legacy and Polygram appeal. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

Jay S. Bowen, Katharine R. Cloud and Chris L. Vlahos, Nashville, Tennessee, for the appellant, Polygram Records, Inc.

J. Graham Matherne and Christian A. Horsnell, Nashville, Tennessee, Vincent H. Chieffo, Santa Monica, California, and Keith Adkinson, Hartsville, Tennessee, for the appellees, Randall Hank Williams, Jr. and Jett Williams.

Kenneth R. Jones, Jr., and William B. Hawkins, III, Nashville, Tennessee, for the appellee, Legacy Entertainment Group, LLC.

**OPINION**

From 1947 through January of 1953, Hank Williams was under contract with MGM Records, Inc.[1] during which term Williams assigned unto MGM his "exclusive personal services . . . for the purpose of making phonograph records . . ." During the same period, specifically 1951 and 1952, Hank Williams and his band, The Drifting Cowboys, frequently performed live and by pre-recordings on a WSM radio program known as Mother's Best Flour. The pre-recordings were preserved on acetate records[2] for broadcast on days Williams and the Drifting Cowboys were on tour or otherwise unavailable. WSM only used the acetate recordings to facilitate daily broadcasts of the Mother's Best Flour program; it never exploited the acetate recordings to produce phonograph records.

In 1997, Legacy Entertainment Group acquired the 1951 and 1952 acetate recordings for the purpose of producing and selling compact disc formats of Williams' performances from the Mother's Best Flour program. Legacy acquired the acetate recordings from Hillous Butrum, who had acquired the recordings from Les Leverett, a former employee of WSM. Leverett, who worked as a photographer for WSM, found the recordings in or near a trash bin at WSM in the 1960s when the radio station was moving its offices. Though it is not fully evident from the record, apparently WSM was discarding a lot of its possessions during the move, the acetate recordings of the Mother's Best Flour program being some of many discards. Leverett dug through the trash bin,[3] retrieved some of the acetate recordings and took them home for his personal collection. After letting them collect dust for several years, Leverett sold to Butrum whatever interest, if any, he had in the recordings.

As Legacy was preparing to commercially exploit the Mother's Best Flour performances of Hank Williams by producing and selling them on compact discs, the technological progeny of phonograph records, Polygram learned of Legacy's intentions and informed Legacy that Polygram owned the exclusive exploitation rights of Williams' performances for phonograph records and compact discs. After discussions between Polygram and Legacy failed, Polygram filed this action against Legacy, claiming it had the exclusive rights to exploit the recordings. Hank Williams, Jr. and Jett Williams, as Hank Williams' heirs, joined Polygram as co-plaintiffs against Legacy, claiming they succeeded to Hank Williams' rights in the recordings, and in addition thereto, the rights of publicity in his name and likeness.

---

[1] Williams entered into three separate recording contracts with MGM Records. He signed the first one, which was for a one year term, on March 6, 1947, and it took effect April 1, 1947. The second and third contracts were for two year terms each and had identical language as the first. The second and third contracts spanned from 1949-1952.

[2] Radio acetate transcriptions were defined in one of the parties' briefs as "large discs used for reproducing musical performances on radio stations." *See Greenfield v. Phillies Records*, 780 N.E.2d 166 (N.Y. 2002).

[3] There is some discrepancy over whether the Mother's Best Flour recordings had actually made it into the trash bin before Leveret acquired them, but all parties agree that WSM had at least expressed its intention to dispose of them.

In April of 2000, the trial court summarily dismissed Polygram's claims finding it had no property interest in the recordings. Subsequently, in 2003, Legacy and the heirs filed cross motions for summary judgment. The trial court ruled in favor of the heirs and dismissed Legacy's claims. Polygram and Legacy appeal those rulings.

## STANDARD OF REVIEW

The issues were resolved in the trial court upon summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Advertising & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc*., 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

Summary judgments are proper in virtually all civil cases that can be resolved on the basis of legal issues alone, *Byrd*, 847 S.W.2d at 210; *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001); however, they are not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. The party seeking a summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that party is entitled to judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d at 695. Summary judgment should be granted at the trial court level when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion, which is the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mutual Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001). The court must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd*, 847 S.W.2d at 210; *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

This case also presents a question of contract interpretation. Issues as to interpretation and application of unambiguous contracts are likewise issues of law, the determination of which enjoys no presumption of correctness on de novo appellate review. *Doe v. HCA Health Servs. of Tennessee, Inc* ., 46 S.W.3d 191, 196 (Tenn. 2001).

ANALYSIS

The parties present a total of eleven issues, the essence of most of which are substantially similar. We have, therefore, recast those issues we have identified as dispositive in order to facilitate a more cohesive assessment of the matters at issue on appeal.

LEGACY'S CLAIMS

Legacy claims it owns the right to commercially exploit several recordings of performances by Hank Williams from the WSM radio program, Mother's Best Flour. This claim is based on a chain of title that is comprised of many links. Unfortunately for Legacy, some critical links are missing, the absence of which is fatal to its claim.

The chain of title Legacy relies on comprises a long and windy road during which there was a brief stop in a trash can at a radio station. If a song were written about this matter favorable to Legacy's claim, it might be entitled, "I Found a Gold Mine in the Radio Station Trash." Indeed, although Legacy may have acquired certain tangible rights to WSM's acetate tapes, and the performances by Hank Williams from the 40s and 50s embodied therein are golden, the gold attendant to Hank Williams' performances may not be mined by Legacy. Accordingly, an appropriate title attributable to Legacy's claim would be, "Your Bucket Has a Hole in It."

Legacy's chain of title begins with the relationship between Hank Williams and radio station WSM, which broadcast the Mother's Best Flour and made acetate recordings to facilitate the broadcasts in Hank Williams' absence, when he was on the road. The evidence in the record is undisputed that the recordings were solely for the purpose of broadcasting Hank Williams' performance on the Mother's Best Flour show in his absence and that WSM never used the recordings for any other purpose, nor did anyone else. Evidence of the fact WSM had no further use of the acetate recordings or the performances embodied therein, the acetate recordings were discarded in the 1960s by WSM during its move from downtown Nashville.

It was while the acetate recordings were awaiting their intended disposition by the janitorial staff that Les Leverett, an employee of WSM[4] noticed them. Leverett requested permission to keep the recordings for himself. Receiving a favorable reply, though no contractual rights of any kind or character from WSM, Leverett removed the recordings from the trash and took them home, where they collected dust for several years. On July 12, 1982, Hillous Butrum, a former band member of the Drifting Cowboys, entered into a contract with Leverett whereby he acquired the acetates and "All right, title and interest Leverett has in and to said taped radio shows, . . . ." The agreement

---

[4]Leverett was not an executive or officer of WSM; he was employed as a photographer for WSM.

between Butrum and Leverett provided that Butrum would endeavor to exploit the recordings and then pay Leverett 40% of all monies earned.[5]

Butrum, however, did not intend to exploit Williams' performances as originally recorded. He planned to enhance the acetate recordings by removing "skips" and hissing noises present in the originals and by adding additional background music. After Butrum dubbed the additional music and voice overs, he filed for and obtained copyrights for the re-mixed recordings. Thereafter, Butrum sold the acetate recordings along with the re-mixed masters and copyrights therein to Legacy pursuant to a written contract dated September 12, 1997.

The evidence in the record established for purposes of summary judgment that Legacy acquired physical possession, if not some fashion of ownership of the tangible components of the acetate recordings.[6] Moreover, the evidence established for purposes of summary judgment that Legacy acquired whatever legal rights and interests, if any, Butrum and Leverett had in the recordings. However, the record is devoid of any evidence showing that Butrum or Leverett owned any right, title or interest in the intangible property rights to the performances of Hank Williams preserved by the acetates.

Possession of a tangible embodiment of a work or performance such as the recordings at issue conveys no rights or ownership interests to the intangible rights embodied therein, especially the right to commercially exploit the performances embodied therein. The Supreme Court of the United States has clearly drawn this distinction between tangible rights and intangible rights. In a case wherein the rights to a book were at issue, the Court explained:

> Even the transfer of the manuscripts of a book will not, at common law, carry with it a right to print and publish the work, without the express consent of the author, as the property of the manuscript, and the right to multiply the copies, are two separate and distinct interests.

*Stephens v. Cady*, 55 U.S. 528, 530-531, 1852 WL 6761 (U.S.R.I.), 14 L.Ed.528 (1852) (citations omitted). Accordingly, we must examine Legacy's claim realizing the rights it acquired to the physically tangible acetate recordings are distinct from the rights it acquired, if any, to exploit the performances recorded therein.

---

[5]Butrum explained in his deposition the economic deal with Legacy was conditioned upon Legacy getting the requisite consent from the Williams estate to exploit Williams' performances. We have not considered this evidence for purposes of our opinion because the Chancellor granted Legacy's motion to have all of Butrum's deposition excluded because Butrum died before his deposition was completed. Nevertheless, we add this footnote so that others will not mistakenly believe Butrum intended to exploit Williams' performances without the consent of the Williams estate.

[6]With this statement, we are not declaring that Legacy has a right to the physical acetates, but only that they may have acquired such a right. We will not give a ruling regarding the lawful owner of the physical acetates because that issue is not before us.

Legacy claims to have acquired intangible rights to the performances when it acquired the recordings from Butrum. It also contends it acquired copyrights to the performances embodied in the recordings; however, the record does not establish that it acquired any copyrights in the recordings or performances therein except for those owned by Butrum. As for Butrum's copyright interests, the record provides little information other than the copyright registration numbers associated with Butrum's copyrights. Even though the record is incomplete, it is evident Butrum's copyrights only pertain to the enhancements by Butrum, which afforded Butrum, and thus Legacy, no copyright ownership interest in the original performances by Hank Williams. As Butrum dubbed background music onto the original recordings and made other improvements thereto, whatever copyrights Butrum may have would be limited to his "derivative work," exclusive of the original performances. "The copyright in a derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *Murray Hill Publications, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 630 (6th Cir. 2001) (quoting 17 U.S.C. § 103(b)). Accordingly, the copyright Legacy acquired from Butrum was most limited; it only pertained to Butrum's contributions, and thus did not constitute a copyright interest to the original performances of Hank Williams.

Legacy may have acquired certain tangible rights in the WSM tapes Leverett retrieved from the trash at WSM. Moreover, it may have acquired the copyrights of Butrum, limited as they are. Nevertheless, there is no evidence to support Legacy's claim that it acquired any rights to the performances of Hank Williams embodied in the recordings.

Moreover, there is no evidence to support Legacy's claim that it acquired rights to exploit the name and likeness of Hank Williams in association with the WSM recordings. This novel claim is based on the absence of proof that Williams retained such rights in his contract with WSM for the 1951 and 1952 performances. We find this claim is also without merit.

Tennessee recognizes the property right in the use of one's name, photograph or likeness. This property right is identified as the "right of publicity." In commenting on the nature of the right of publicity, this court has stated,

> the recognition of individual property rights is deeply embedded in our jurisprudence. These rights are recognized in Article I, Section 8 of the Tennessee Constitution and have been called "absolute" by the Tennessee Supreme Court. . . . In its broadest sense, property includes all rights that have value. It embodies all the interests a person has in land and chattels that are capable of being possessed and controlled to the exclusion of others. Chattels include intangible personal property such as choses in action or other enforceable rights of possession. . . . Tennessee's common law thus embodies an expansive view of property. Unquestionably, a celebrity's right of publicity has value. It can be possessed and used. It can be assigned, and it can be the subject of a contract. Thus, there is ample basis for this Court to conclude that it is a species of intangible personal property.

*State ex rel Elvis Presley v. Crowell*, 733 S.W.2d 89, 96-97 (Tenn. Ct. App. 1987) (citations omitted). The right of publicity was adopted by the General Assembly of Tennessee as a result of the foregoing controversy.

> (a)  Every individual has a property right in the use of that person's name, photograph, or likeness in any medium in any manner.
>
> (b)  The individual rights provided for in subsection (a) constitute property rights and are freely assignable and licensable, and do not expire upon the death of the individual so protected, whether or not such rights were commercially exploited by the individual during the individual's lifetime, but shall be descendible to the executors, assigns, heirs, or devisees of the individual so protected by this part.

Tenn. Code Ann. § 47-25-1103.

We are unwilling to infer, indeed to jump to the illogical conclusion that Hank Williams assigned these rights without limitation based on the mere fact his heirs cannot establish that the 1951 informal agreement with WSM provided to the contrary.[7] Moreover, we concur with the trial court's finding that these rights belong to the heirs of Hank Williams. *See Presley*, 733 S.W.2d at 96-97 (holding that a celebrity's right of publicity is survivable at death and passes to the celebrity's heirs).

We therefore affirm the dismissal of the claims of Legacy Entertainment Group, LLC.

## POLYGRAM'S CLAIM

Polygram claims it has the exclusive rights to exploit as phonograph records (including compact discs)[8] the 1951 and 1952 recordings of Hank Williams embodied in the acetate recordings of Mother's Best Flour. Polygram's claim hinges on the 1947 contract between MGM Records and Hank Williams, to which Polygram is the successor in interest to MGM's rights. The trial court found no genuine issue of material fact that would allow Polygram to have an interest in the Mother's Best Flour recordings. We agree with the trial court.

Because Polygram's claim hinges entirely on the contract between MGM Records and Hank Williams, an examination of the rights and responsibilities of the parties to the contract is necessary. "The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions." *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn. Ct. App.

---

[7]*See Gracey v. Maddin*, 769 S.W.2d 497 (Tenn. Ct. App. 1989) wherein this court declined to infer, in the absence of an agreement from the individual or his estate, the assignment of the right to the use of his name as an asset of the partnership, after retirement or death, without proof of the individual's consent.

[8]This is based on the provision in the agreement that MGM "shall have the right to make records or other reproductions of the performances embodied in such recordings by any method now or hereafter known, . . ."

1999) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (other citations omitted). To discern the intentions of MGM and Williams, we must consider the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract, *see Marshall*, 20 S.W.3d at 681, and give the words of the contract their usual and ordinary meaning." *Gredig v. Tennessee Farmers Mutual Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994) (citing *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn. Ct. App. 1986)) (other citations omitted).

The contract between Williams and MGM was in the form of a letter from MGM to Williams employing Williams' "exclusive personal services . . . for the purpose of making phonograph records, as [MGM] may require." The contract also provided, "during the period of this contract [Williams] will not perform for the purpose of making phonograph records for any person other than [MGM] . . . ."

Polygram claims its predecessor in interest, MGM, had an "exclusive services" contract with Williams that included the period when the Mother's Best Flour performances were recorded. We agree with this claim but only to the extent the exclusivity pertains to recordings made for the purpose of making phonograph records. We have considered the language of the contract on which Polygram wants us to focus our attention. That portion reads, "All recordings and all records and reproductions made therefrom, together with the performances embodied therein, shall be entirely our property, free of any claims whatsoever by you or any person deriving any right or interest from you." We, however, may not restrict our reading to this one excerpt because we must look to the four corners of the contract to appreciate the intentions of the parties. *See Marshall*, 20 S.W.3d at 681. In considering the entire contract, we find it significant that the first page of the contract places its focus on "*recordings made for the purpose of making phonograph records*." (emphasis added).

Although the contract provided that Williams could not perform for anyone else "for the purpose of making phonograph records," nothing in the contract affords MGM or Polygram the present right to exploit recordings of performances by Hank Williams that were for purposes other than producing phonograph records, such as a pre-recorded radio broadcast.[9] Moreover, there is no evidence in the record to establish that the Mother's Best Flour performances were recorded for the purpose of making phonograph records. Accordingly, the trial court correctly found the performances by Hank Williams embodied in the Mother's Best Flour acetate recordings did not fall

---

[9]Whether Polygram had the legal right to preclude others from exploiting the 1951 and 1952 performances as phonograph records or compact discs is a different issue. We recognize that another provision of the MGM agreement precluded Williams from performing any musical compositions recorded under the MGM agreement "for the purpose of making phonograph records, within five years after our recording is made. . . ." The five year exclusivity period has long since expired; thus the provision is inapplicable to the matters at issue, and we decline to volunteer an advisory opinion.

within the purview of the contract between MGM and Hank Williams.[10]  We therefore affirm the summary dismissal of Polygram's claims.

<u>RIGHTS POSSESSED BY THE HEIRS OF HANK WILLIAMS</u>

In addition to summarily dismissing the claims of Legacy and Polygram, the trial court granted summary judgment in favor of the heirs of Hank Williams, concluding there was no genuine dispute of material fact as to the heirs' ownership of the rights to control the use of and/or exploit Hank Williams' performances in the acetate recordings of the Mother's Best Flour radio broadcasts. The trial court's dismissal of all claims of Legacy and Polygram based upon the conclusions that neither has any right or interest in the recordings at issue, and our affirmance thereof, renders the issue moot because neither Legacy or Polygram have standing to challenge the rights of the heirs of Hank Williams.

**IN CONCLUSION**

The judgment of the trial court is affirmed in all respects, and costs of appeal are assessed against Polygram Records, Inc. and Legacy Entertainment Group, LLC.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[10] Polygram contends the trial court misunderstood the nature of the rights Polygram was asserting.  The trial court held that Polygram's "claims depend upon its having a property interest in those recordings . . . ."  This, however, is not a misunderstanding because Polygram would need at the very least an intangible property interest in the recordings to have a claim.  The trial court's failure to use the word intangible does not mean it misunderstood the nature of Polygram's asserted rights.  Polygram's claim could only be sustained if it had an property interest in the recordings, intangible or otherwise, and the contract between MGM and Williams does not afford Polygram that interest.