John W. PARKER, Plaintiff,

v.

UNION PLANTERS CORPORATION,
Defendant.

No. 01–2070 D/V (M1).

United States District Court,
W.D. Tennessee,
Western Division.

May 23, 2002.

Donald A. Donati, Esq., William B. Ryan, Donati Law Firm, LLP, Memphis, for John W. Parker, plaintiffs.

Herbert E. Gerson, Esq., Licia Michelle Williams, Ford & Harrison, LLP, Memphis, for Union Planters Corporation, defendants.

## MEMORANDUM OPINION AND ORDER

DONALD, District Judge.

Before the Court are cross motions for summary judgment. The parties have responded to each other's motion, and then replied to each other's response. The

Court heard argument on the motions on April 17, 2002. Having reviewed the parties' briefs and supporting documents, and having heard the oral arguments of counsel, the Court GRANTS Defendant's motion for judgment as to Plaintiff's ERISA Section 502 claim[1], and DENIES Plaintiff's motion for judgment on the same claim. In addition, the Court DENIES Defendant's motion for summary judgment as to Plaintiff's ERISA Section 510 claim.

## I. Summary Judgment Is Not Available in ERISA Denial of Benefit Actions

This case arises from a dispute regarding the denial of retirement benefits. Plaintiff claims: (1) Defendant's denial of benefits constitutes a violation of ERISA Section 502, 29 U.S.C. § 1132(a)(1)(B); and (2) his firing for the purpose of interfering with the attainment of benefits violates ERISA Section 510, 29 U.S.C. § 1140.[2] In his motion, Plaintiff seeks summary judgment on his Section 502 claim. In its motion, Defendant seeks summary judgment on both of Plaintiff's claims.

The Court observes at the outset of this discussion that neither party seems to be aware of the procedure for resolving ERISA denial of benefits actions established in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir.1998).[3] In response to "great confusion among the district courts as to the proper method of adjudicating proceedings brought under 29 U.S.C. § 1132(a)(1)(B)," the Sixth Circuit determined that the summary judgment procedures set forth in Rule 56 are inapplicable to ERISA actions. *Id.* at 617.[4] The court then set forth guidelines for district courts to follow in adjudicating ERISA denial of benefit actions. As to the merits of the claim, the *Wilkins* court instructs the district court to conduct a *de novo* review based solely upon the administrative record and render findings of fact and conclusions of law accordingly.[5] *Id.* at 619.

1. The Employee Retirement Income Security Act of 1974 ("ERISA") is codified at 29 U.S.C. § 1001 *et seq.*.

2. On October 12, 2001, the Court dismissed Plaintiff's state law claims, jury demand, and claim for punitive damages.

3. Both Plaintiff and Defendant have cited *Wilkins* in their pleadings, but failed to follow the procedure set forth therein. Both cite *Wilkins* only for the proposition that a court should apply arbitrary and capricious review when a benefits plan grants discretion to the administrator. (Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. Judg., p. 24; Mem. in Supp. of Def.'s Mot. for Summ. Judg., p. 23.)

4. The Panel included Judges Ryan, Cole, and Gilman. Judge Cole authored the portion of the opinion with which all three judges agreed, affirming the district court's judgment in favor of the Plan Administrator and affirming the district court's ruling that evidence which was not submitted to the Plan Administrator is not to be considered by the court. Judge Gilman wrote a concurring opinion regarding the summary judgment issue, stating that summary judgment under Rule 56 is an inappropriate way to review the Plan Administrator's decision. Judge Gilman's opinion was joined by Judge Ryan, but not by Judge Cole. Because that portion of the opinion commanded a majority of votes from the Panel, it is binding precedent in this Circuit.

5. Although in fashioning the *Wilkins* standard, the court did not mention arbitrary and capricious review, this Court does not believe that the Sixth Circuit intended to contravene *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), or overrule its previous rulings in *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996) and *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979 (6th Cir.1991), which clearly provide for arbitrary and capricious review if the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. This issue is discussed in detail *infra* in Section II.A. of this Opinion.

■ Thus, with respect to Plaintiff's ERISA Section 502 claim, both parties have improperly moved for summary judgment. Nonetheless, the Court will proceed as if their motions seek the affirmance or reversal of the plan administrator's denial of benefits decision. With respect to Plaintiff's Section 510 claim, Defendant properly moved for summary judgment. Consequently, the Court will apply the Rule 56 summary judgment standard in reaching a decision on that claim in Section III of this opinion.

## II. Section 502 Claim

Pursuant to ERISA Section 502, a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Plaintiff asserts that his "benefits were vested upon the 'Change in Control' which occurred upon the merger between Defendant and Leader Federal.'" (Am.Compl., ¶ 26.) Plaintiff claims that Defendant's "refusal ... to pay benefits under the [Supplemental Executive Retirement Plan ("SERP")] constitutes a violation of ERISA" Section 502. *Id.*

Under ERISA, the SERP constitutes a "top hat plan," as it is unfunded and maintained by Defendant primarily for the purpose of providing deferred compensation for a select group of management or highly-compensated employees. *See* 29 U.S.C. § 1051(2). Top hat plans "are expressly exempted from most of the substantive ERISA requirements normally employed to protect workers' interests in their plans." *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 436 (3d Cir.2001); *see also Wolcott v. Nationwide Mutual Insurance Co.,* 884 F.2d 245, 250 (6th Cir.1989); *Fraver v. North Carolina Farm Bureau Mutual Ins. Co.,* 801 F.2d 675, 676–78 (4th Cir.1986). Therefore, the Court need only

evaluate the denial of benefits under the terms of the SERP, rather than under any substantive provisions of ERISA.

## A. Standard of Review

In *Firestone Tire and Rubber Co. v. Bruch,* the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the appropriate standard is arbitrary and capricious. 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Sixth Circuit has interpreted *Bruch* to "require that the plan's grant of discretionary authority to the administrator be 'express.'" *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir.1996) (citing *Perry v. Simplicity Eng'g,* 900 F.2d 963, 965 (6th Cir.1990)).

Defendant argues that the Court should apply the arbitrary and capricious standard of review to the plan administrator's decision because the SERP expressly grants discretionary authority to the administrator. (Mem. in Supp. of Def.'s Mot. for Summ. Judg., pp. 23–25.) Plaintiff argues that the Court should apply a *de novo* standard of review. (Pl.'s Mem. in Reply to Def.'s Resp. to Pl.'s Mot. for Partial Summ. Judg., pp. 16–17.) Plaintiff urges the Court to rely on a Third Circuit decision holding that denial of benefits under a top hat plan is always subject to *de novo* review. *Id.* at 16. Alternatively, Plaintiff argues that he is entitled to *de novo* review because he was denied the procedural protections set forth in his SERP and those provided under ERISA. *Id.* at 17.

■ The Court will apply a *de novo* standard of review, but for different reasons than those asserted by Plaintiff. Simply put, the language in the SERP

does not grant the plan administrator the type of discretion required to trigger the more deferential standard of review.

Article III, Section 3.2 of the SERP states, in relevant part:

*General Powers of Administration.* Employer is hereby designated as a fiduciary under the Agreement. Employer, as fiduciary, *shall have authority to control, interpret and manage the operation and administration of the Agreement.*

(emphasis added). After a careful review of Sixth Circuit caselaw on this issue, the Court has determined that the language in the SERP is most similar to the plan language analyzed in the cases of *Borda v. Hardy, Lewis, Pollard & Page, P.C.,* 138 F.3d 1062 (6th Cir.1998), and *Chiera v. John Hancock Mutual Life Ins. Co.,* 3 Fed.Appx. 384 (6th Cir.2001)[6].

Article II, Section 2.6 of the plan in *Borda* provided: "The Administrator shall have the power to make determinations with respect to all questions arising in connection with the administration, interpretation, and application of the Plan..." 138 F.3d at 1066. The Sixth Circuit held that this plan contained "a broad grant of discretionary authority to determine eligibility for benefits and to construe the terms of the plan," which warranted arbitrary and capricious review. *Id.* at 1066, 1068. In *Chiera,* the relevant language of that plan provided: "The Plan Administrator has authority to control and manage the operation and administration of the Plan ..." 3 Fed.Appx. at 388. The court held that *de novo* was the appropriate standard of review because the benefit plan did not grant sufficient discretionary authority to the administrator. *Id.*

The SERP in this case provides that the plan administrator "shall have authority to control, interpret and manage the operation and administration of the Agreement." Clearly, this plan grants some discretion to the administrator, but it is not as clear that it is sufficient to trigger the more deferential review. Like in *Borda,* the administrator in this case has been given discretion to *interpret* the plan. Like in *Chiera,* however, that discretion has been limited to the *operation* and *administration* of the plan. The language in the SERP, therefore, falls squarely between the language in the plans analyzed in those two cases. Rather than engaging in grammatical gymnastics in order to determine whether the grant of discretion in the SERP is closer by degree to that in *Borda* or *Chiera,* the Court will look to other Sixth Circuit cases for guidance.

The Sixth Circuit applied the arbitrary and capricious standard of review in *Benham v. Disability Portion of the Life and Disability Plan,* 2001 WL 223850 (6th Cir. 2001), *Yeager,* 88 F.3d at 376, and *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979 (6th Cir.1991). Each of those cases involved the denial or termination of disability benefits, and in each case, the court found that the plan administrator had been granted the discretion to determine whether there was sufficient proof that the participant was disabled. *Benham,* at 281; *Yeager,* 88 F.3d at 380–81; *Miller,* 925 F.2d at 983.

■ Analysis of those cases reveals that there is a qualitative difference between determining the sufficiency of a claim that a participant is disabled, and determining whether, under the defined terms of a contract, a participant is eligible for benefits. The former involves a subjective judgment as to the sufficiency and veracity of the claim presented, whereas the latter

---

**6.** Although citation to unpublished Sixth Circuit precedent is disfavored, this case is referred to because of its factual similarity to the case at hand, which is crucial to determination of the proper standard of review.

involves objective contractual interpretation. Under Supreme Court and Sixth Circuit precedent, that difference dictates which standard of review to apply. When the plan itself has granted the administrator the discretion to subjectively evaluate the sufficiency of a claim for benefits, the administrator's decision should be given some deference. Otherwise, the administrator's decision should be reviewed *de novo*.

In the present case, rather than requiring the plan administrator to exercise subjective judgment to determine whether a claim is sufficient, the SERP merely requires the plan administrator to interpret the contract and grant benefits when its defined terms have been met. Therefore, the appropriate standard of review is *de novo*.

■ In conducting a *de novo* review, a court may consider the parties' arguments concerning the proper analysis of the evidence contained in the administrative record. It may not admit or consider any evidence not presented to the administrator, except where there is a procedural challenge to the administrator's decision. *Wilkins*, 150 F.3d at 619; *see also Frankenmuth Mutual Ins. Co. v. Wal–Mart Assoc. Health and Welfare Plan*, 182 F. Supp 2d 612, 615–16 (E.D.Mich.2002); *Biondo v. Life Ins. Co. of North America*, 116 F. Supp 2d 872, 873 n. 1 (E.D.Mich.2000); *Eriksen v. Metropolitan Life Ins. Co.*, 39 F. Supp 2d 864, 865–66 (E.D.Mich.1999); *Marchetti v. Sun Life Assurance Co.*, 30 F. Supp 2d 1001, 1004 (M.D.Tenn.1998).

**B. Procedural Protections**

■ Plaintiff argues that Defendant denied him the procedural protections set forth in the SERP Agreement and those provided under ERISA at 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(f). (Pl.'s Mem. in Reply to Def.'s Resp. to Pl.'s Mot. for Part. Summ. Judg., p. 17; Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. Judg., pp. 26–28).[7]

Plaintiff's SERP Agreement provides in Article III, Section 3.2:

... Any decision by Employer of the Board denying a claim by Participant or a Beneficiary for benefits under the Agreement shall be stated in writing ... Such statement shall set forth the specific reasons for the denial, written to the best of the Employer's ability in a manner that may be understood without legal counsel. In addition, Employer shall afford a reasonable opportunity to the Participant or Beneficiary for a full and fair review of the decision denying such claim....

In addition to the procedural protections provided in the Agreement, ERISA provides that every employee benefit plan shall:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

---

7. The Court notes that 29 U.S.C. § 1133 is among the administration and enforcement provisions of ERISA. Top hat plans are not exempt from the reporting, disclosure, administration, and enforcement provisions of ERISA. *See Miller v. Heller*, 915 F.Supp. 651, 653 (S.D.N.Y.1996) (citing *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 930–931 (3d Cir.1985)). Therefore, Plaintiff's allegation that Defendant failed to comply with the claims procedure set forth in 29 U.S.C. § 1133 must be addressed.

29 U.S.C. § 1133. Moreover, the regulations promulgated under this section require the plan administrator to notify the participant of the adverse benefit determination "within a reasonable time, but not later than 90 days after receipt of the claim ..." 29 C.F.R. § 2560.503–1(f)(1).

The evidence submitted by Plaintiff with respect to the alleged procedural violations is largely undisputed by Defendant. On May 25, 2000, Plaintiff was involuntarily terminated by Defendant. Sometime after his involuntary termination, Plaintiff made a demand for payment of benefits under the SERP. On December 22, 2000, Plaintiff's counsel wrote a letter to Defendant "to determine whether Mr. Parker is eligible for benefits" under the SERP. Plaintiff's counsel asked that "[i]f Mr. Parker's claim for benefits has been denied," Defendant identify the date that decision was made, by whom, and the specific reason for the denial. Plaintiff's counsel also asked Defendant to provide information concerning steps Plaintiff could take to obtain further review.

On January 3, 2001, Defendant's Corporate Secretary responded by letter informing Plaintiff's counsel that Plaintiff was not entitled to benefits because he did not qualify as an "Eligible Participant" when he was terminated. The Secretary also stated that "[t]his position has been clarified with Mr. Parker's previous attorney in the past."

■ The Court agrees with Plaintiff that Defendant denied him certain procedural protections provided by the SERP Agreement and ERISA. Following his termination in late May of 2000, Plaintiff was notified of his denial of benefits orally, rather than in writing. In fact, he was not provided with a written notice of denial until January 3, 2001, well after the 90–day time period set forth in the regulations. See 29 C.F.R. § 2560.503–1(f)(1). In response to Plaintiff's request for information, which Defendant had failed to provide, Defendant failed to comply with the standards set forth in the SERP Agreement and ERISA. Finally, Defendant did not afford Plaintiff a reasonable opportunity for a full and fair review of the decision denying his claim for benefits. See 29 U.S.C. § 1133(2). For these reasons, the Court finds that Defendant violated the terms of the SERP Agreement and ERISA.

■ Because Defendant failed to honor procedural protections set forth by the SERP Agreement and ERISA, there is no identifiable administrative record in this case. For this reason, the Court can not limit its *de novo* review to the evidence available to the plan administrator. Instead, the Court will consider all of the evidence submitted by the parties relevant to the denial of benefits. See *VanderKlok v. Provident Life and Accident Ins. Co., Inc.,* 956 F.2d 610, 616–17 (6th Cir.1992).[8]

---

**8.** The Court realizes that *VanderKlok* was decided before the Sixth Circuit announced the *Wilkins* standard in 1998, but notes that the holding of *VanderKlok* was not affected by the creation of the *Wilkins* standard.

In *Wilkins,* the court explained that district courts should not consider evidence outside of the administrative record unless "that evidence is offered in support of a procedural challenge to the administrator's decision ..." 150 F.3d at 619. The court did not explain, however, the extent to which evidence outside the administrative record can be used to resolve claims which are not procedural in nature.

The reasoning in *VanderKlok* permitting a district court to review evidence outside the administrative record does not conflict with the reasoning of the *Wilkins* standard. Importantly, it is consistent with Congress' goal in enacting ERISA of providing workers and beneficiaries with an inexpensive and expeditious method of resolving benefits disputes. See *Perry,* 900 F.2d at 967. Remanding this matter to the plan administrator for "full and fair review" at this point in the litigation,

## C. Findings of Fact

Plaintiff was employed by Defendant for a total of 24 years. During the last ten years of his employment, from March 1990 until April 2000, he served as Executive Vice President and Chief Financial Officer ("CFO") of Union Planters Corporation ("UPC"). Plaintiff is highly educated, with an undergraduate degree· in accounting and an M.B.A. in finance.

In 1995, Defendant retained the services of executive compensation consultants at Towers Perrin to present information concerning the establishment of a SERP at UPC. The SERP was intended to replace the existing Deferred Compensation plan in which certain executives were participants.

On February 23, 1995, the Board of Directors adopted a SERP based upon the recommendations of the Salary and Benefits Committee, UPC management, and Towers Perrin. The SERP provides as follows:

> The terms and provisions of the Plan shall be set forth in separate Supplemental Executive Retirement Agreements ("Agreements") which shall be entered into by every Employer executive officer who participates in the Plan. Each Agreement may vary, in the sole discretion of the Employer's board of directors with respect to its terms and conditions.

The individual agreements were drafted by Defendant's attorney. After reading the document, Plaintiff entered into a Supplement Executive Retirement Agreement ("Agreement"), effective February 23, 1995.[9] Plaintiff did not attempt to negotiate any of the terms in his Agreement, nor did he seek the advice of an attorney before entering into the Agreement.

Plaintiff's Agreement differs from the agreements entered into by the four other executives. According to Plaintiff's Agreement, Article II, Section 2.5:

> Should a Change in Control occur, Participant will be entitled to the Normal Retirement Benefit following an involuntary termination of employment, without regard to the Participant's age or years of service at the time of the involuntary termination of employment and without regard to whether the Participant has become an Eligible Participant...

In the other executives' agreements, the equivalent section provides for benefits following involuntary termination prior to normal retirement age; but there is no "Change in Control" provision. The other executives obtained better terms as consideration for relinquishing their existing Deferred Compensation Plans. Plaintiff did not have such a plan to relinquish.

On May 9, 1995, Defendant created a trust entitled "Trust Under Union Planters Corporation Supplemental Executive Retirement Plan." This "Rabbi Trust" was established as a means by which Defendant could contribute assets that would be held until paid to participants as specified in the SERP agreements.

In Article I, Section 1.5 of Plaintiff's Agreement, "Change in Control" was defined, in pertinent part, as:

> (c) the effective date of a(i) merger or consolidation of Employer with one or more other corporations as a result of which the holders of the Voting Stock of Employer immediately prior to such merger or consolidation hold less than

after both parties have conducted exhaustive discovery and submitted lengthy motions, would be expensive and ineffective.

**9.** The other UPC executives who entered into individual SERP Agreements were Ben Rawlins, Jackson Moore, Kirk Walters, and James Gurley.

Eighty Percent (80%) of the Voting Stock of the surviving or resulting corporation, or (ii) a sale or transfer of a majority of the property of Employer, other than to an entity of which Employer controls 80% or more of the Voting Stock.

The same definition of "Change in Control" is found in the Rabbi Trust.

In October 1996, Defendant acquired Leader Federal, which resulted in a change in control as defined in the 1995 Agreement. Defendant's Board of Directors was never informed that this merger resulted in a change in control as defined in Plaintiff's Agreement. As CFO, it was Plaintiff's duty to report the change in control to the Board of Directors or to UPC's auditors. Despite the fact that he had concluded that the merger constituted a change in control under his Agreement, Plaintiff did not fulfill this duty, nor did he take any action to book any liability, perform any accounting function, or require any deposits to be made in the Rabbi Trust.

Plaintiff's Agreement contemplates modifications. Section 4.1 provides:

Any amendment to this Agreement shall be made pursuant to a resolution of the Board and, if such agreement directly or indirectly affects the benefits payable under the Agreement, such amendment must be mutually agreed to in writing by Participant . . .

On April 23, 1997, Plaintiff's Agreement was amended to alter the definition of "Change in Control," among other definitions, in a writing signed by Plaintiff.[10] Plaintiff was told that the amendment was intended to correct technical inconsistencies in Defendant's benefit plans and agreements. When presented with the amendment, Plaintiff did not request an explanation regarding the effect of the amendment with respect to the Leader Federal merger, consult an attorney, or read the amendment before signing it.

Sometime during the years 1999 and 2000, the Board of Directors recognized the need for a more experienced CFO. The Board offered the position to Bobby Doxey in January 2000, and Doxey accepted, effective March 1, 2000. On May 25, 2000, Plaintiff was involuntarily terminated by Defendant. After his involuntary termination, Plaintiff made a demand for payment of benefits under the SERP. Plaintiff was informed by Rawlins and Moore that he was not entitled to SERP benefits.

## D. Conclusions of Law

Plaintiff first argues that the 1997 amendment to his SERP Agreement was only prospective and lacked mutual assent. As a result, Plaintiff asserts, the Court need only address the language of Section 2.5 in the SERP Agreement in order to resolve this claim. Plaintiff next argues that the language of the 1995 Agreement unambiguously means that when a change in control occurs, a participant becomes entitled to benefits if involuntarily terminated *any time* after the change in control occurred. Plaintiff argues that the 1996 Leader Federal merger constituted a change in control, and his involuntary termination in 2000 caused his right to benefits to vest.

Defendant agrees that the 1997 amendment only had a prospective effect, but disagrees that it lacked mutual assent. Defendant also agrees that the plain meaning of Section 2.5 of the Agreement dictates the outcome of this dispute. Defendant argues, though, that the two con-

---

**10.** The definition of "Change in Control" in the Rabbi Trust was amended in the same manner on the same date.

ditions constitute a "double trigger," meaning that both events must occur before the participant's right to benefits vests. Defendant argues that Plaintiff's involuntary termination did not follow a change in control, as that term is defined following the 1997 amendment, and that he is not, therefore, entitled to benefits.

■ In situations where the substantive provisions of ERISA are not at issue, federal courts are expected to develop a body of federal common law to resolve claims. *Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.*, 31 F.3d 371, 374 (6th Cir.1994). In developing federal common law rules of contract interpretation, the Sixth Circuit relies upon state law and general contract law principles. *Regents of the Univ. of Michigan v. Agency Rent–A–Car*, 122 F.3d 336, 339 (6th Cir.1997).

■ The general principles of contract law dictate that this Court interpret ERISA plan provisions according to their plain meaning in an ordinary and popular sense. *Regents of the Univ. of Mich.*, 122 F.3d at 339. In applying this plain meaning analysis, the Court "must give effect to the unambiguous terms of an ERISA plan." *Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir.1996). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions. *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn.Ct.App.1999). In the case of written contracts, these intentions are reflected in the contract itself. *Id.* Thus, the search for the contracting parties' intent should focus on: 1) the four corners of the contract; 2) the circumstances in which the contract was made; and 3) the parties' actions in carrying out the contract. *Id.; see also Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn.1998); *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn.

1990); *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn.1983).

The Court will begin its plain meaning analysis by determining whether the 1997 amendment was in effect at the time Plaintiff was involuntarily terminated in 2000, and if so, what effect it had. By way of background, Defendant and Leader Federal merged in 1996. This event constituted a change in control as the term was defined in the 1995 Agreement. On April 23, 1997, the Agreement was amended to alter the definition of "Change in Control." Under the 1997 definition, the 1996 merger would not have qualified as a change in control. Following the 1997 amendment, no event occurred which qualified as a change in control.

■ Plaintiff presents two arguments to persuade the Court that the 1997 amendment should not impact the resolution of this dispute. Plaintiff argues first that the 1997 amendment merely affected a technical change in the definition of "Change in Control," and that it did not retroactively make a substantive change to the definition. The Court fails to see the significance of Plaintiff's distinction between "technical" and "substantive" change in this context, but nonetheless agrees that the 1997 amendment was not retroactive. The 1997 amendment did not alter the fact that the 1996 merger constituted a change in control. Contrary to Plaintiff's assertion, though, that fact is of no moment. As is explained, *infra*, the Court construes Section 2.5 of Plaintiff's Agreement to require both a change in control and an involuntary termination to occur before Plaintiff is entitled to benefits. Therefore, the Court need only be concerned with the prospective effect of the 1997 amendment since Plaintiff was not terminated until May 25, 2000.

■ Plaintiff next argues that there was no mutual assent among the parties:

1) to cut back on Plaintiff's SERP benefits; or 2) to nullify the 1996 change in control. Even assuming that the 1997 amendment did cut back on Plaintiff's SERP benefits, there is no reason to believe that the amendment lacked mutual assent. Pursuant to Section 4.1 of the Agreement, any amendment that directly or indirectly affects the benefits payable to a participant must be mutually agreed to in writing by the participant. Plaintiff is highly educated, and had served as Defendant's CFO for seven years when he signed the amendment. He was capable of reading the amendment to determine what impact it might have on his eligibility for benefits. Nonetheless, when presented with the amendment, Plaintiff did not request an explanation regarding the effect of the amendment with respect to the Leader Federal merger. He did not consult an attorney, or even read the amendment before signing it. Plaintiff's signature on the amendment is sufficient proof of his assent to the prospective impact of the amendment on the benefits available to him.

As to Plaintiff's second argument, the Court determined, *supra*, that the 1997 amendment did not, in fact, nullify the 1996 change in control because it is not retroactive. Therefore, the Court need not ascertain whether there was mutual assent among the parties to do what was not actually done.

■ The Court will now look at the relevant provision of the Agreement. "Should a Change in Control occur, Participant will be entitled to the Normal Retirement Benefits *following* an involuntary termination of employment ..." (Pl.'s SERP Agreement, Section 2.5)(emphasis added). The effect of this provision turns on the intended meaning of the word "following."

In Plaintiff's view, the change in control is a condition precedent and the involuntary termination is a condition subsequent. Once the condition precedent occurs, there is no temporal or causative limitation on the occurrence of the condition subsequent. Defendant argues, on the other hand, that the meaning of "following" is immediate and causative; Plaintiff would only have been entitled to benefits if he had lost his job because of or shortly after a change in control.

■ "Following" is used as a preposition in the Agreement. The definition of the prepositional use of "following" is "subsequent to." *See* Webster's Ninth New Collegiate Dictionary 479 (1983). The dictionary definition does not place any limit on the amount of time "subsequent to." Plaintiff argues that if Defendant had intended "following" to mean "immediately following," it should have used that language. But, Defendant asserts that it did not intend for "following" to have an unlimited duration, and that it is unreasonable to construe the term to have that meaning. The disagreement between the parties demonstrates that the term "following" is indefinite.[11]

Plaintiff's explanation of the intended meaning of "following" is unreasonable for two reasons. First, the plain meaning of Section 2.5 of the SERP Agreement is that two conditions must be satisfied prior to the participant becoming entitled to bene-

---

**11.** The Court underscores the point that the term "following" is indefinite rather than ambiguous. Ambiguity requires two reasonable interpretations. Here, there is a disagreement between the parties about the meaning of this term, but the Court finds that only one of the parties' interpretations is reasonable. Mere disagreement between the parties does not create ambiguity in the legal sense, *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir.1992), and a court should avoid strained constructions that create ambiguities where none exist. *Marshall*, 20 S.W.3d at 682.

fits. Second, construing the language to mean that the second condition could occur for an unlimited amount of time after the occurrence of the first condition creates an impermissibly unlimited contractual right.

The parties intended that Plaintiff become entitled to benefits only after he was involuntarily terminated because of or shortly after a change in control. In other words, both conditions precede entitlement to benefits. This interpretation is supported by the parties' actions in carrying out the contract. *See Marshall*, 20 S.W.3d at 681. Defendant's Board of Directors was never informed that the 1996 merger resulted in a change in control. As CFO, it was Plaintiff's duty to report the change in control to the Board of Directors or to Defendant's auditors. Despite the fact that he had concluded that the merger constituted a change in control under the definition in his SERP Agreement, Plaintiff did not fulfill this duty, nor did he take any action to book any liability, perform any accounting function, or require any deposits to be made in the Rabbi Trust. Neither party acted as though the 1996 change in control fulfilled a condition precedent in Plaintiff's SERP Agreement requiring funding of the Rabbi Trust. The parties' actions demonstrated instead that absent a simultaneous involuntary termination, there was no need to fund the Rabbi Trust because Plaintiff had not yet become entitled to his SERP benefits.

The second reason that Plaintiff's interpretation is unreasonable is that "courts are reluctant to interpret contracts providing for some perpetual or unlimited contractual right unless the contract clearly states that that is the intention of the parties." *William B. Tanner Co., Inc. v. Sparta–Tomah B'casting Co., Inc.*, 716 F.2d 1155, 1159 (7th Cir.1983) (citing 3 A. Corbin, Corbin on Contracts § 553 (1960)). There is no clear statement of indefinite

duration in this Agreement—merely the indefinite term, "following."

An example will help demonstrate this point. If Plaintiff had been 45 years old on January 1, 1995, he would have been eligible to voluntarily terminate his employment and receive normal retirement benefits upon reaching the age of 62. (*See* Pl.'s SERP Agreement, Sections 1.9, 1.14, 2.6.) If Plaintiff had been involuntarily terminated at any time after the 1996 Leader Federal Merger, he would have become entitled to normal retirement benefits. Under Plaintiff's interpretation, in this example the term "following" would include a period of at least 16 years—the period of time between the merger and Plaintiff's attainment of age 62. It is unreasonable to infer such a potentially lengthy period of time between conditions without an explicit statement of intent to that effect.

In sum, Defendant correctly determined that Plaintiff was not entitled to benefits under Section 2.5 of his SERP Agreement because his involuntary termination did not follow a change in control, as that term was defined on the date of his termination. In addition, Defendant correctly determined that Plaintiff was not eligible for SERP benefits under any other section of the Agreement. (*See* Pl.'s SERP Agreement, Sections 1.9, 1.14.)

**E. Reformation of the Agreement**

█ In the alternative, Plaintiff asks the Court to reform the Agreement to contain the "exact same terms and conditions as the other participants," and "to require the payment of benefits to Plaintiff following involuntary termination." (Mem. in Supp. of Pl.'s Mot. for Part. Summ. Judg., pp. 23–24.) In support of his request, Plaintiff asserts that his SERP Agreement was varied without authoriza-

tion from the Board of Directors, as was required by the Plan.

 The reformation of a contract is an equitable remedy applicable where there is a mutual mistake of the parties. *Cincinnati Ins. Co. v. Post*, 747 S.W.2d 777 (Tenn.1988); *Pierce v. Flynn*, 656 S.W.2d 42 (Tenn.Ct.App.1983). A party seeking reformation must prove the grounds by clear and convincing evidence. *Post*, 747 S.W.2d at 781. The remedy of reformation provides an equitable means to carry out the true intent of the parties where it is clear that the contract, as written, does not accurately reflect that intent. *Vakil v. Idnani*, 748 S.W.2d 196 (Tenn.Ct. App.1987). Where there has been a meeting of the minds as to a contract, but the written instrument does not express what was really intended by the parties, the instrument may be reformed to conform to the agreement according to the intention of the parties. *Post*, 747 S.W.2d at 777.

Plaintiff asserts that judicial modification of agreements is permissible under Tennessee law pursuant to a far less stringent standard than that cited in the preceding paragraph. Plaintiff cites the Tennessee Supreme Court decision in *Central Adjustment Bureau v. Ingram*, 678 S.W.2d 28 (Tenn.1984), as support for his contention. In that case, the court determined that it could exercise its equitable powers to modify a covenant not to compete which was unreasonably broad. *Id.* at 36. The court limited the reach of its holding, though, to covenants not to compete because of their "special nature." *Id.* at 37. That decision is inapposite, therefore, because this case does not involve a covenant not to compete.

Plaintiff has not met the stringent test set forth by the Tennessee courts for reformation of a contract. The SERP provides that the individual agreements with the executives may vary, in the sole discretion of the Employer's Board of Directors,

with respect to its terms and conditions. Plaintiff has submitted evidence intended to prove that the Board of Directors never authorized the addition of the change in control provision in Section 2.5 of Plaintiff's Agreement. The evidence submitted, though, does not tend to prove that the presence of that term in Plaintiff's Agreement was a result of a mutual mistake. The evidence also does not demonstrate clearly and convincingly that the Board of Directors never approved the variation.

The most compelling reason to refrain from reforming the contract, though, is that there is no "meeting of the minds" as to the inclusion of Section 2.5 in Plaintiff's Agreement. *See Post*, 747 S.W.2d at 777. Therefore, the Court will limit itself to interpreting the agreement as written rather than rewriting it over the objection of one party.

In conclusion, the Court FINDS that Defendant's interpretation of Section 2.5 of Plaintiff's SERP Agreement was correct. The Court further FINDS that at the time of Plaintiff's termination, he was not entitled to SERP benefits under any other provision in the Agreement. For these reasons, and because the Court declines to reform the contract, the Court hereby GRANTS judgment to Defendant on Plaintiff's ERISA Section 502 claim.

### III. Section 510 Claim

Pursuant to ERISA Section 510, "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ..." 29 U.S.C. § 1140. Plaintiff asserts that Defendant fired him for the purpose of inter-

fering with the attainment of benefits to which he would be entitled under the Agreement. (Am.Compl., ¶ 29.) Defendant seeks summary judgment on this claim.

## A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate, *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. Factual Findings

In February 2000, Plaintiff was informed that Defendant had hired a new CFO, Bobby Doxey, to whom he would report, but that he would retain the titles of Executive Vice President and Treasurer. Defendant asserts that Doxey and Plaintiff met to discuss the asset liability management of Defendant, including the prior purchase of a funds transfer pricing system and the need to upgrade the existing single transfer pricing system. Plaintiff disputes, however, that Doxey asked him to implement a new transfer pricing system. Defendant contends that Doxey

wanted Plaintiff to make progress in implementing a transfer pricing system and to securitize certain assets, but that by May of 2000, necessary progress was not being made. Plaintiff disputes that he was requested by Doxey to complete either of these tasks. Defendant maintains that Doxey was frustrated with Plaintiff's failure to execute concepts designed to reduce Defendant's interest rate risk exposure, but Doxey never criticized Plaintiff's performance orally or in writing.

Defendant contends that Doxey alone made the decision to terminate Plaintiff's employment, and that he was unaware of the SERP when he made that decision. Plaintiff disputes this contention, too, and insists that Doxey consulted with Rawlins and Moore before making the decision to terminate him, and that Doxey was aware of Plaintiff's participation in the SERP.

On May 25, 2000, Doxey notified Plaintiff that he was being terminated. Doxey told Plaintiff that it had nothing to do with poor performance on his part, but that there was a duplication of skills. On April 24, 2001, Defendant stated that Plaintiff was terminated because he was not the right person for the position. Six months later, Defendant asserted that Plaintiff was fired because he failed to complete certain tasks, resisted change, and refused to follow Doxey's instructions.

## C. Analysis

To state a claim under ERISA Section 510, the "plaintiff must show that an employer had a specific intent to violate ERISA." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir.1997) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992)). In the absence of direct evidence of such discriminatory intent, the plaintiff can state a *prima facie* case by showing the existence of 1) prohibited employer conduct 2) taken for the

purpose of interfering 3) with the attainment of any right to which the employee may become entitled. *Smith,* 129 F.3d at 865 (quoting *Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir.1987)). In order to survive a motion for summary judgment, a plaintiff must come forward with evidence from which a reasonable jury could find that the defendant's desire to avoid pension liability was a determining factor in plaintiff's discharge. *Smith,* 129 F.3d at 865.

Defendant argues that Plaintiff can not make out a *prima facie* case. Defendant's central argument is that the undisputed facts prove that Doxey alone made the decision to terminate Plaintiff, and that he did so without any knowledge of the SERP. Thus, Defendant reasons, the termination decision could not have been motivated by a desire to avoid benefits liability.

■ Defendant's has not met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" on this point. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Plaintiff has provided proof refuting Defendant's assertion that Doxey made the termination decision alone. Likewise, Plaintiff refutes Defendant's contention that Doxey was unaware of Plaintiff's participation in the SERP. There is, therefore, a material issue of fact as to whether Plaintiff can establish a *prima facie* case.

■ Assuming the plaintiff can state a *prima facie* case under Section 510, the employer can rebut the presumption of impermissible action raised by the *prima facie* case by introducing "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Id.* (quoting *Gavalik,* 812 F.2d at 853). This shifts the burden back to the plaintiff to show that the employer's proferred reason was mere pretext. *Smith,* 129 F.3d at 865. "Summary judgment is appropriate if the plaintiff fails to ... rebut the employer's profer

of a legitimate, nondiscriminatory reason for its actions." *Id.*

■ Assuming *arguendo* that Plaintiff has made out a *prima facie* case, Defendant asserts that Plaintiff was terminated because he "was not performing at the level required and, therefore, UPC was not in the financial position the Board expected." (Mem. in Supp. of Def.'s Mot. for Summ. Judg., p. 32.) Defendant's evidence of a nondiscriminatory reason, though, is contradicted. On May 25, 2000, Doxey told Plaintiff that his termination had nothing to do with job performance. Almost one year later, in response to one of Plaintiff's interrogatory questions, Defendant asserted that Plaintiff was terminated because he was not the right person for the job. Six months after offering that reason, Defendant offered another—that Plaintiff failed to complete certain tasks, resisted change, and refused to follow Doxey's instructions. In response to the allegations of failure to complete certain tasks and refusal to follow Doxey's instructions, Plaintiff has provided evidence indicating that he may never have been given those tasks and instructions. Thus, there is a material issue of fact as to whether Defendant's articulated reason for terminating Plaintiff is pretextual.

In sum, summary judgment is not proper with respect to this claim because there are disputed material facts. The Court, therefore, DENIES Defendant's motion for summary judgment on Plaintiff's Section 510 claim.

## IV. Conclusion

For the foregoing reasons, the Court hereby GRANTS Defendant's motion for judgment as to Plaintiff's ERISA Section 502 claim, and DENIES Plaintiff's motion for judgment on the same claim. The Court DENIES Defendant's motion for

summary judgment as to Plaintiff's ERISA Section 510 claim.