IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 14, 2010 Session

# COLLATERAL PLUS, LLC, ET AL. v. MAX WELL MEDICAL, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 08-2534-II     Carol L. McCoy, Chancellor**

---

**No. M2010-00638-COA-R3-CV - Filed March 29, 2011**

---

This is an appeal of the grant of a motion for summary judgment. The parties entered into a loan management agreement providing that a placement fee would be paid only upon the occurrence of certain conditions. The agreement explicitly provided that it would terminate when the underlying bank loan was satisfied. When the underlying loan was repaid, the conditions precedent to the payment of the placement fee had not occurred. The Appellee sought payment of the placement fee when the Appellant was acquired a year later, which the Appellant refused on the grounds that the agreement had terminated. Because the agreement states unequivocally that it terminates upon repayment of the underlying loan, making the placement fee provision unenforceable, we reverse the summary judgment award in favor of the Appellee. We hold that, instead, summary judgment should have been entered in favor of the Appellant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J., joined. RICHARD H. DINKINS, J., dissenting.

Michael L. Dagley, Joshua R. Denton, Wendee M. Hilderbrand, Nashville, Tennessee, for the appellant, MAX Well Medical, Inc.

Robert J. Walker, John C. Hayworth, Erin Palmer Polly, Nashville, Tennessee, for the appellees, Collateral Plus, L.L.C., and Collateral Guaranty Fund, L.P.

## OPINION

### I. BACKGROUND

In this contract dispute, Collateral Plus, L.L.C. and Collateral Guaranty Fund, L.P. (collectively, "Collateral") entered into a Loan Management Agreement ("LMA") with MAX Well Medical, Inc. ("MAX Well") dated January 12, 2006. MAX Well was in financial distress, and Collateral offered to assist MAX Well to obtain refinancing and additional working capital. Collateral is in the business of providing credit enhancements to emerging and growth stage companies that have difficulty obtaining traditional bank financing. Typically, Collateral enhances the credit worthiness of borrowers by providing letters of credit and guarantees of debt.

Pursuant to the terms of the LMA, Collateral provided letters of credit and other credit enhancements and agreed to act as paying agent for a line of credit from SunTrust Bank to MAX Well up to $4,500,000. In consideration for supplying these guarantees, credit enhancements, and facilitating the line of credit, MAX Well agreed to pay Collateral certain fees. The fees included a restructuring fee of $90,000 payable at closing, a commitment fee of $90,000 payable at closing, a monthly advisory fee of $7,500, a monthly funding fee of one percent of the outstanding balance, and other incidental fees and excess interest payments. The LMA also provided for "a placement fee of $900,000.00, payable upon a change of control of [MAX Well], sale of [MAX Well], or the acquisition of [MAX Well's] assets."

The LMA included a section entitled "Term," which provided in part:

This Agreement shall be effective as of the date first written above and shall continue in full force and effect until such time as [MAX Well's] indebtedness with respect to the Loan has been paid in full. . . . [I]f [MAX Well] is not then in breach of the Loan and there has not been a material adverse change with respect to the business or assets of [MAX Well], then [Collateral], shall work to refinance the balance of the Loan for an additional eleven (11) months. Upon such extension, [MAX Well] shall pay to [Collateral] a one percent (1%) renewal fee and all other fees including but not limited to the additional interest rate spread of three percent (3%) on the outstanding balance paid monthly, the advisory fee of $7,500.00 per month, and the funding fee of one percent (1%) on the outstanding balance paid monthly. There will be no restructure fee or commitment fee on the renewal but the placement fee due on the sale of [MAX Well] will remain in place.

The parties agree MAX Well could not have survived financially for more than a month or so without the debt guaranty from Collateral and the loan from SunTrust Bank. When MAX Well and Collateral were working out the terms of the LMA, MAX Well was in discussions with another company regarding a put/call option whereby the other company could acquire MAX Well if certain financial performance targets were met. When the parties executed the LMA, both Collateral and MAX Well assumed that MAX Well would either be sold to this other company pursuant to the put/call option agreement or that MAX Well would simply go out of business.

A company called Fresenius Medical Care North America ("Fresenius") acquired the holder of the put/call agreement, and in February, 2007, Fresenius joined Specialty Care Services Group ("SCSG") to acquire thirty-one percent of MAX Well's outstanding stock ("31% Transaction"). As part of this 31% Transaction, Fresenius and SCSG guaranteed $4 million of new debt taken on by MAX Well. This new debt allowed MAX Well to pay off the balance of the $4.5 million line of credit that was the subject of the LMA. On March 15, 2007, MAX Well paid off all outstanding indebtedness on the bank loan.

Approximately one year later, on or about February 29, 2008, Fresenius purchased the remaining sixty-nine percent of MAX Well ("69% Transaction"). Thereafter, Collateral demanded its $900,000 placement fee. MAX Well declined to pay this fee on the basis that the LMA had terminated by its own terms on March 15, 2007, when MAX Well paid off the outstanding balance of its $4.5 million line of credit. Therefore, according to MAX Well, the conditions triggering its obligation to pay the $900,000 placement fee were not satisfied prior to the LMA's termination. This lawsuit followed.

While the parties were engaged in discovery, MAX Well sought information from Collateral regarding Collateral's usual and prior treatment of and expectations with regard to fees similar to the placement fee in other contracts similar to the LMA. Collateral objected to MAX Well's requests, claiming extrinsic evidence about Collateral's typical fee structures was irrelevant, because the LMA was unambiguous and the court need look no further than the four corners of the LMA to determine whether or not the placement fee was payable. MAX Well filed a motion to compel, which the trial court denied based on both MAX Well's and Collateral's contentions that the LMA was unambiguous, rendering parol evidence inadmissible.

MAX Well then moved for summary judgment, arguing that according to the plain language of the LMA, the $900,000 placement fee was a conditional obligation that did not survive the termination of the LMA. According to MAX Well, the express terms of the LMA provided that the LMA terminated when MAX Well paid the outstanding portion of its $4.5 million debt. In the absence of a clause specifying that the placement fee was meant

to survive the termination of the LMA, MAX Well argued the termination provision of the LMA applied to the entire agreement, including MAX Well's obligation to pay Collateral the placement fee. Collateral filed a cross-motion for summary judgment. Collateral argued the $900,000 placement fee was an obligation MAX Well incurred upon the execution of the LMA, and that it became payable in February 2008, when Fresenius acquired the remaining 69% of MAX Well. Collateral agreed with MAX Well that the remainder of the LMA terminated when MAX Well repaid its loan in March 2007.

## II. TRIAL COURT'S RULING

Following a hearing, the trial court granted Collateral's motion for summary judgment. The court found the placement fee was an incentive to Collateral to guarantee MAX Well's debt obligations and was earned when the LMA was executed in January 2006. The trial court explained:

> When MAX Well secured the agreement with Collateral, it gained a significant benefit. In exchange for that significant benefit, it agreed to a placement fee of $900,000 that was set forth clearly and expressly in the agreement.
>
> It is suggested that because the term of the loan management agreement ended upon the payment of the loan in full that MAX Well now has no obligation to come forward and pay the placement fee of $900,000. This Court respectfully disagrees and finds that the time for performance under this agreement is set forth very clearly in the terms that follow: The time for performance of that placement fee was upon the change of control of the borrower, the sale of the borrower, and the acquisition of the borrower's assets. This language is in keeping with what the parties contracted for at the time they entered into the agreement.
>
> It is urged upon the Court that there needed to be an expressed provision to allow this obligation to survive the payment of the loan. Once again, the Court respectfully disagrees. The placement fee was earned by Collateral upon the execution of the loan management agreement and the corresponding security, guaranties, letters of credit, and other credit enhancements that they provided to allow MAX Well to obtain a $4.5 million loan from the bank.
>
> The time for performance was also set forth in this agreement. This would not go on in perpetuity, and the parties recognize that. The parties acknowledge that at the time the loan was made, the financial status of MAX Well was very precarious. It was anticipated that MAX Well would be sold. . . .

In making this construction of the contract, the Court finds that it is fair and reasonable and it places the construction upon the contract that the parties intended at the time they executed the agreement.

Following the trial court's granting of Collateral's motion for summary judgment, MAX Well duly filed a Notice of Appeal. MAX Well contends on appeal that the trial court erred in concluding the placement fee survived the termination of the LMA and in granting Collateral's motion for summary judgment. Alternatively, MAX Well contends the trial court erred in denying its motion to compel Collateral to produce additional documents MAX Well requested during discovery.

### III. ANALYSIS

The trial court made a careful and thoughtful analysis of the arrangements between the parties and the obligations arising therefrom. The court applied the well-known principles of contract interpretation that are set out below. Using those same principles, the majority herein has simply reached a different conclusion, while the dissenting member of the panel would agree with the trial court's determination. We think the difference in outcome is the result of emphasis on different principles.

The trial court found the agreement to be unambiguous, implied into it a reasonableness standard, and, looking at the situation at the time the LMA was entered into, applied a construction it considered fair and reasonable. The court determined that the placement fee was earned at the time of the loan and that the time for performance, *i.e.*, payment of the fee, was upon a change of control or sale of MAX Well or its assets, regardless of the termination of the agreement. The dissent also believes that the fee was earned when Collateral secured the financing for MAX Well and became payable when the remainder of MAX Well's stock was sold, in spite of the fact that the LMA had terminated by then.

The majority, however, determined the issue based on its interpretation of the words used in the LMA. These are sophisticated parties, engaged in a specialized arrangement, and represented by counsel throughout the contracting process. We hold them to what they said in the agreement, not what they may have intended to say.

In reviewing the trial court's ruling, this court reviews findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006). Questions of law are reviewed *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

The question of interpretation of a contract is a question of law. *Guiliano v. Cleo, Inc*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id*.; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). Our review is governed by well-settled principles.

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co.,* 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.*, 78 S.W.3d at 890.

Thus, courts defer to the contracting process by enforcing written contracts, which establish the rights and obligations of the parties, according to their plain terms without favoring either contracting party. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985); *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995). Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

The parties agree the placement fee in the LMA was subject to a condition precedent and was not payable unless or until one of three conditions occurred: (1) a change of control of MAX Well, (2) a sale of MAX Well, or (3) the acquisition of MAX Well's assets. If none of these events occurred, the placement fee would never become payable.

As discussed, the LMA included a termination provision: "This Agreement shall be effective as of the date first written above and shall continue in full force and effect until such time as the Borrower's indebtedness with respect to the Loan has been paid in full." The LMA defines "Agreement" as "this Loan Management Agreement, as this Agreement may be modified or amended from time to time, together with all exhibits and schedules attached hereto." "Loan" is defined as "a line of credit in the amount of up to $4,500,000 (the "Loan Amount") to be evidenced by the Note hereinafter defined (the "Loan")."

Collateral and MAX Well agree that the LMA terminated when MAX Well paid off the outstanding portion of its loan on March 15, 2007. The only issue the parties dispute is whether or not MAX Well's obligation to pay Collateral the $900,000 placement fee survived the termination of the LMA. In other words, was the placement fee enforceable when the LMA was no longer in force.

In support of its motion for summary judgment, Collateral introduced evidence of the parties' circumstances when the LMA was being negotiated. This evidence showed that MAX Well could not have survived for more than a month or so without the debt guaranty from Collateral and the loan from the bank. MAX Well apparently had no financing options available to it other than the terms Collateral presented in the LMA.

Collateral's evidence also showed that when Collateral and MAX Well executed the LMA in January 2006, MAX Well was in discussions with Renal Care Group ("RCG") regarding a put/call option agreement whereby RCG could acquire MAX Well if certain performance targets were met. Thus, when the parties entered into the LMA, both MAX Well and Collateral assumed RCG would acquire MAX Well or that MAX Well would go ut of business. This evidence, however, becomes relevant only if the LMA is ambiguous. The LMA does not mention or refer in any way to the parties' assumptions regarding RCG's potential or impending acquisition of MAX Well.

The trial court did not make a finding that the LMA was unambiguous, but the parties agreed in their memoranda of law as well as in open court that the LMA was unambiguous. We agree that the agreement is not ambiguous. When a contract's language is clear and unambiguous, "the contract is interpreted according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'" *Maggart v. Almany Realtors*, 259 S.W.3d 700, 704 (Tenn. 2008) (quoting *Bob Pearsall Motors v. Regal Chrysler-Plymouth*, 521 S.W.2d 578, 580 (Tenn. 1975)). "The interpretation should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." *Maggart*, 259 S.W.3d at 704; *see Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985) (court must view entire contract from beginning to end because one clause may modify, limit, or

illuminate another); *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d at 890 (courts must determine parties' intentions based on literal meanings of words parties used in the contract when contract is unambiguous).  The court enforces the parties' contract as it is written; it does not make a new contract for the parties.  *Maggart*, 259 S.W.3d at 703-04*; Berry v. Prudential Ins. Co. Of America*, 134 S.W.2d 886, 889-90 (Tenn. Ct. App. 1939).  As we said in *Sumner County Bd. of Educ. v. Carden Co.*:

> The court, at arriving at the intention of the parties to a contract, does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written.  All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract.

No. M2005-2670-COA-R3-CV, 2006 WL 2069413, at *2  (Tenn. Ct. App. 2006) (quoting *Eatherly Const. Co. v. HTI Memorial Hosp.*, 2005 WL 2217078 (Tenn. Ct. App. 2005)).

Looking at the entire LMA, the plain language of the "Term" section of the LMA clearly provides that if the LMA were renewed, MAX Well would be required to pay Collateral  a 1% renewal fee, the monthly additional interest rate spread of 3% on the outstanding balance, the monthly advisory fee of $7,500, the monthly funding fee of 1% on the outstanding balance, and the placement fee if one of the conditions upon which that fee was payable were met.  MAX Well would not be required to pay a restructure fee or commitment fee if the LMA were renewed.  If the parties intended the placement fee to survive the termination of the LMA, there would have been no reason to specify MAX Well's obligation to pay the conditional placement fee in the event the LMA were renewed.

Perpetual contracts are not favored under the law.  *Higgins v. Oil, Chemical, and Atomic Workers Int'l Union*, 811 S.W.2d 875, 881 (Tenn. 1991); *see Johnson v. Welch*, 2004 WL 239756, at *10 (Tenn. Ct. App. 2004) ("courts are loathe to infer a perpetual obligation"); *Parker v. Union Planters Corp.*, 203 F. Supp. 2d 888, 901 (M.D. Tenn. 2002) (courts are reluctant to enforce perpetual contracts unless contract is clear that is the parties' intent).  MAX Well contends the placement fee becomes a perpetual obligation if the Court does not conclude MAX Well's obligation to pay the placement fee terminated when the LMA terminated.  We agree.  In this case MAX Well was acquired approximately one year following the LMA's termination.  What if MAX Well were acquired five, ten, or fifty years later?  Would Collateral still argue the placement fee was due?

Collateral argues the LMA does not entitle it to a perpetual right to collect the placement fee because a "reasonableness" standard is implied in all contracts, and where a contract does not explicitly specify the time for performance, courts will imply a reasonable time for performance. Collateral argues this Court's application of a reasonable time to the contracts in *Birkholz v. Hardy*, 2004 WL 1801736 (Tenn. Ct. App. 2004) and *Seraphine v. Aqua Bath Co.,* M2000-02662-COA-R3-CV, 2003 WL 1610871 (Tenn. Ct. App. 2003), controls the outcome of this case. While Collateral is correct that courts will imply a reasonable time for contractual obligations to be performed when a contract does not so provide, this rule of construction is not applicable here because the LMA specifically states the conditions under which the placement fee is due, and the LMA includes a termination provision that applies by its terms to the entire LMA.[1]

The LMA is clear, unambiguous, and unequivocal. First, it states the placement fee is due only when or if there is a change of control of MAX Well, a sale of MAX Well, or an acquisition of MAX Well's assets. Second, it states the LMA terminates when MAX Well's indebtedness with respect to the loan has been paid in full. Limiting our interpretation of the LMA to the four corners of the LMA, as we must since we find the agreement unambiguous, the only conclusion we can reach is that while the LMA remained in effect, MAX Well was obligated to pay the enumerated fees to Collateral, including the conditional placement fee, but that when the LMA terminated on March 15, 2007, all MAX Well's fee obligations to

---

[1]In *Birkholz v. Hardy*, a promissory note was given for the purchase of real property, and the note contained a condition precedent providing that the principal would not be due until the buyers sold commercial property they owned. The promissory note did not contain a termination clause, nor did it specify when the condition precedent must be performed. 2004 WL 1801736, at *5 (Tenn. Ct. App. 2004). Under those circumstances, we applied a "reasonable time standard" to the promissory note. *Id*. at *7. The LMA in the case before us, in contrast, contains a termination provision that applies to the entire LMA, including the conditional placement fee obligation. Therefore, it would be inappropriate for this Court to supplant that express provision with any other implicit provision, reasonable or otherwise, as Collateral suggests.

In *Seraphine v. Aqua Bath Co.,* an employment agreement containing a stock option was at issue, and the question was whether or not the employee could exercise his stock option after his employment with the company terminated. 2003 WL 1610871, at *1-2. As was the case in *Birkholz*, the agreement in *Seraphine* did not contain a termination provision, and it was therefore not clear from the terms of the agreement whether or not the employee could exercise his stock option after his employment had terminated. *Id.* at *8-9. This court ultimately held the stock option survived the employee's termination of employment in *Seraphine* for reasons particular to stock option agreements and to the facts of that case. *See Seraphine*, 2003 WL 1610871, at *4-10. Contrary to Collateral's suggestion, the employee's termination in *Seraphine* is not analogous to the LMA's termination in this case. The case at bar is governed by the express terms of the LMA, whereas the agreement in *Seraphine* contained no express terms addressing whether or not the employee's stock option was dependent on the employee's continued employment. Thus, the ultimate holding in *Seraphine* is applicable here.

Collateral ceased as well, including the placement fee.

The placement fee provision was simply not enforceable after the LMA was no longer in force. The LMA does not state or in any way suggest that its termination depends on the satisfaction of the conditions precedent to the payment of the placement fee. If the parties intended the placement fee to survive the termination of the LMA, they could have, and indeed should have, included specific language to that effect. As we said in *Seraphine v. Aqua Bath Co.*:

> Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves. *Petty v. Sloan*, 197 Tenn. 630, 640 277 S.W.2d 355, 359 (1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise.

2003 WL 161871, at *4.

We reverse the grant of summary judgment to Collateral. We further hold that MAX Well's motion for summary judgment should have been granted. We need not address MAX Well's alternative argument regarding its motion to compel, as that issue is now moot.

The judgment of the trial court is reversed and the trial court is directed to enter judgment in favor of MAX Well upon remand. Costs of this appeal are taxed to the Appellees, Collateral Plus, L.L.C., and Collateral Guaranty Fund, L.P., for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE